**KASOWITZ LLP**
Stephen W. Tountas (ID: 037962003)
One Gateway Center, Suite 2600
Newark, NJ 07102
Telephone: (973) 645-9462

*Liaison Counsel*

**LABATON KELLER SUCHAROW LLP**
Carol C. Villegas (*pro hac vice* forthcoming)
Christine M. Fox (*pro hac vice* pending)
Adam M. Federer (*pro hac vice* pending)
John C. Coyle IV (ID: 467722024)
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700

*Co-Lead Counsel for Lead Plaintiffs*

**ROBBINS GELLER RUDMAN & DOWD LLP**
Tor Gronborg (*pro hac vice*)
Trig R. Smith (*pro hac vice*)
Heather G. Geiger (*pro hac vice*)
John M. Kelley (*pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 231-1058

**MOTLEY RICE LLC**
Daniel R. Lapinski (ID: 004612001)
210 Lake Drive East, Suite 101
Cherry Hill, NJ 08002
Telephone: (856) 667-0500

*Co-Lead Counsel for Lead Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| IN RE MERCK & CO., INC. SECURITIES LITIGATION | Master File No. 2:25-cv-01208-JXN-AME<br><br>Hon. Julien Xavier Neals<br>United States District Judge<br><br>Hon. André M. Espinosa<br>United States Magistrate Judge<br><br><u>Demand for Jury Trial</u> |

## AMENDED CLASS ACTION COMPLAINT
## FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**TABLE OF CONTENTS**

I.     INTRODUCTION ............................................................................................. 2

II.    JURISDICTION AND VENUE ...................................................................... 9

III.   THE PARTIES................................................................................................. 9

       A.    Lead Plaintiffs............................................................................... 9

       B.    Defendants .................................................................................... 10

IV.    RELEVANT NON-PARTIES MENTIONED IN COMPLAINT ................... 12

       A.    Additional Merck Executives ...................................................... 12

       B.    Confidential Witnesses ................................................................ 13

V.     RELEVANT BACKGROUND ...................................................................... 14

       A.    Gardasil's Approval as an HPV Vaccine...................................... 14

       B.    Driven by Sales in China, Gardasil was Key to Merck's Business ...................... 15

       C.    Merck Focuses on Selling Gardasil in China's Wealthier Cities.......................... 17

             1.    Gardasil Costs Several Times More than Its Competition And is Sold Only in the Private Market ................................................ 17

             2.    Because of Gardasil's High Price, Merck's Market was China's Wealthier Cities Where the Company Faced Less Competition ............. 18

             3.    Merck Assures Investors That Because It Operates in the Private Segment, China's Economic Slowdown Was Not Affecting Gardasil Sales.......................................... 21

       D.    Zhifei Exclusively Markets and Distributes Gardasil in China ........................... 21

             1.    December 2020 Supply Agreement ........................................... 22

             2.    January 2023 Supply Agreement ............................................... 23

VI.    OVERVIEW OF THE FRAUD....................................................................... 25

       A.    Red Flags in China Belie Merck's Stated Drivers of Growth ........................... 25

             1.    The Lack of Demand and Slowing Sales of Gardasil in China Force Merck to Move Millions of Gardasil Doses Intended for China Into Other Geographical Regions................................. 28

2.  Recognizing that China Was No Longer a Growth Opportunity for Gardasil, Merck Ramps Down Gardasil Manufacturing Plans for 2024 ............................................................................................. 29

B.  The Lack of Demand for Gardasil in China Results in Millions of Doses of Gardasil Inventory Stockpiled at Zhifei ................................................................ 32

VII.  DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD ...................................................... 33

A.  Defendants' Materially False and Misleading Gardasil Growth Statements ........ 34

1.  Q3 2023 Earnings Call (October 26, 2023) .............................................. 34

2.  Q3 2023 10-Q (November 3, 2023) ........................................................... 37

3.  UBS BioPharma Conference (November 8, 2023) .................................... 37

4.  Jefferies London Healthcare Conference (November 16, 2023) .............. 38

5.  Goldman Sachs Healthcare C-Suite Unscripted Conference (January 4, 2024) ...................................................................................... 38

6.  J.P. Morgan Healthcare Conference (January 8, 2024) ........................... 39

7.  Q4 2023 Financial Results Press Release (February 1, 2024) .................. 40

8.  Q4 2023 Earnings Call (February 1, 2024) ............................................... 40

9.  2023 10-K (February 26, 2024) ................................................................. 41

10.  Q1 2024 Financial Release Press Release (April 25, 2024) ..................... 42

11.  Q1 2024 10-Q (May 3, 2024) .................................................................... 42

12.  Bank of America Healthcare Conference (May 15, 2024) ....................... 43

13.  Q2 2024 Earnings Call (July 30, 2024) .................................................... 43

14.  Q3 2024 Earnings Call (October 31, 2024) .............................................. 44

B.  Defendants' Materially False and Misleading Risk Disclosure Statements ......... 45

1.  Q3 2023 10-Q (November 3, 2023) ........................................................... 45

2.  2023 10-K (February 26, 2024) ................................................................. 48

3.  Q1 2024 10-Q (May 3, 2024) .................................................................... 50

ii

C.     Defendants' Materially False and Misleading Gardasil Supply Constraint Statements ........................................................................................... 50

1.     UBS BioPharma Conference (November 8, 2023) ................................... 51

2.     Goldman Sachs Healthcare C-Suite Conference (January 4, 2024) ......... 52

3.     TD Cowen Healthcare Conference (March 5, 2024) ............................... 52

4.     Q1 2024 Earnings Call (April 25, 2024) .................................................. 53

D.     Defendants' Materially False and Misleading Gardasil Stepdown Statements ........................................................................................... 54

1.     Q2 2024 Earnings Call (July 30, 2024) ................................................... 54

2.     Q2 2024 10-Q (August 5, 2024) ............................................................. 56

3.     Morgan Stanley Healthcare Conference (September 5, 2024) ................. 57

4.     Q3 2024 Earnings Call (October 31, 2024) ............................................. 59

5.     Q3 2024 10-Q (November 6, 2024) ......................................................... 61

6.     Citi Global Healthcare Conference (December 5, 2024) ......................... 61

7.     J.P. Morgan Healthcare Conference (January 13, 2025) ......................... 62

VIII.     ADDITIONAL ALLEGATIONS OF LOSS CAUSATION ............................................ 63

A.     July 30, 2024: Q2 2024 Financial Results (*First Partial Disclosure*) ................. 65

B.     October 31, 2024: Q3 2024 Financial Results (*Second Partial Disclosure*) ........ 69

C.     February 4, 2025: 2024 Financial Results (*Third Disclosure*) ............................ 72

IX.     POST CLASS PERIOD EVENTS ............................................................................ 77

A.     Merck's 2024 10-K Reveals No More Growth Expected for Gardasil in China ........................................................................................... 77

B.     China Approves Gardasil for Males in January 2025 ......................................... 78

C.     Merck Pivots Away from Gardasil as Demand in China Languishes ................. 79

X.     ADDITIONAL SCIENTER ALLEGATIONS ............................................................. 81

A.     Senior Merck Executives, Including the Individual Defendants, Closely Monitored Gardasil Sales, Demand, and Inventory Levels in China ................. 82

B. MSD and Merck Executives, Including the Individual Defendants, Met to Discuss Trends in China ...................................................................... 86

C. Gardasil was at the Core of Merck's Business and the Individual Defendants Spoke Frequently About the Importance of Gardasil in China ......... 87

D. Former Merck Employees Confirm that Defendants Knew or Recklessly Disregarded that Gardasil Vaccination Levels were Approaching a Market Saturation Point by the Start of the Class Period ................................... 90

E. Defendants Admit During and After the First Partial Disclosure on July 30, 2024 That They Always Expected the Saturation of the Female Gardasil Market in China ...................................................................... 92

F. The Individual Defendants' Class Period Stock Sales Support an Inference of Scienter ................................................................................................ 93

    1. The Individual Defendants Suspiciously Sell Stock in February 2024 Before the First Partial Disclosure at Class Period Price Highs ................................................................................................ 95

    2. The Nominal Amount and Percentage of Merck Stock Sold During the Class Period by Defendants Davis and Litchfield Was Substantial and their Trading Was Inconsistent with Prior Trading Practices ........................................................................................... 96

G. Merck Admitted Early in the Class Period that Neither the Ongoing Economic Slowdown nor the Anti-Bribery/Anti-Corruption Campaign Being Conducted by the Chinese Government Were Affecting Gardasil Demand in The Company's Target Private Market ............................................. 99

XI. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET .............................................................................................................. 101

XII. NO SAFE HARBOR; INAPPLICABILITY OF BESPEAKS CAUTION DOCTRINE ............................................................................................................ 102

XIII. CLASS ACTION ALLEGATIONS ............................................................................ 103

COUNT I Against All Defendants for Violations of Section 10(b) and Rule 10b-5(b) Promulgated Thereunder ................................................................................. 105

COUNT II Against All Defendants for Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a)/(c) Promulgated Thereunder ............................................. 108

COUNT III Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act ............................................................................................... 109

iv

PRAYER FOR RELIEF ......................................................................................................... 110

JURY TRIAL DEMANDED................................................................................................. 111

Court-appointed Lead Plaintiffs AMF Tjänstepension AB ("AMF"), KBC Asset Management NV ("KBC"), and Wayne County Employees' Retirement System ("Wayne County"), by and through their undersigned counsel, bring this Action individually and on behalf of all persons and entities who or which purchased or otherwise acquired the publicly traded common stock or exchange-traded call options or sold exchange-traded put options of Merck & Co., Inc. ("Merck" or the "Company") during the period from October 26, 2023 to February 3, 2025, inclusive (the "Class Period"), and were damaged thereby (the "Class"). This federal securities class action is brought pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78a, *et seq*., the "Exchange Act") and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5, "Rule 10b-5") against Defendants Merck, Robert M. Davis ("Davis"), Caroline Litchfield ("Litchfield"), Joseph Romanelli ("Romanelli"), and Jannie Oosthuizen ("Oosthuizen," together with Davis, Litchfield, and Romanelli, the "Individual Defendants," and collectively with Merck, the "Defendants").

Lead Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Lead Plaintiffs' information and belief is based upon, among other things, the investigation conducted by and through counsel, which included review of: (i) Merck's public filings with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (ii) securities analyst reports about Merck and its Chinese distributor; (iii) transcripts of Merck's investor conference calls and conference appearances; (iv) Merck's press releases and publicly available presentations; (v) press and media reports, including online news sources; (vi) other publicly available material obtained in connection with Lead Plaintiffs' continuing investigation; (vii) interviews of former Merck employees ("Confidential

Witnesses" or "CWs") and others with knowledge of the matters alleged herein;[1] and (viii) consultation with an economic expert. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    INTRODUCTION

1.    Merck operates in the intensely competitive international healthcare industry as one of the largest biotechnology and pharmaceutical companies in the world.

2.    Prior to the Class Period, the majority of Merck's sales stemmed from its pharmaceutical segment, driven by two products, one of which was Gardasil, Merck's human papillomavirus ("HPV") vaccine — a "key product" and the Company's then-second bestselling product. Merck relied heavily on the Chinese market for Gardasil sales and set expectations that China was a growth opportunity for the vaccine.

3.    A variation of Merck's vaccine protecting against four types of HPV (Gardasil 4) was first approved in mid-2017 in China and subsequently, a variation protecting against nine types of HPV (Gardasil 9) was approved in 2018.

4.    Prior to the rollout of Gardasil 9 in China, pent-up demand for Gardasil from those who could afford the pricey vaccine in China outstripped supply for several years. Gardasil became the fastest selling product in China to achieve $1 billion in sales and Merck's second highest grossing product, with China leading the way as the vaccine's most profitable geographic area by a wide margin.  Gardasil's early success in China was driven by demand among young professional

---

[1] Confidential witnesses will be identified herein by number (CW-1, CW-2). All CWs will be described in the masculine to protect their identities.

women in the country's largest and wealthiest cities (Beijing, Shanghai, Guangzhou, and Shenzhen, also known as "Tier 1" cities).

5.    Against the backdrop of Gardasil's pre-Class Period success in the Chinese market, throughout the Class Period, Defendants duped investors into believing that the strong demand for the pricey vaccine in China remained and that sales of Gardasil in China would continue to drive revenue growth for years to come, with overall Gardasil sales reaching or surpassing $11 billion by 2030.

6.    However, Defendants knew or recklessly disregarded serious obstacles that indicated that China was not a growth opportunity for Merck. Those obstacles began to appear prior to the Class Period in mid-2022, when Gardasil sales growth stalled as China's Tier 1 cities approached market saturation for the eligible cohort (females aged 16-26). Merck was then forced to attempt to generate interest for Gardasil in China's less economically developed cities. Merck knew this would be a challenge because HPV vaccination was voluntary and the price of Gardasil (approximately $580 for a 3 dose regimen) compared to competitor HPV vaccines (some of which sold for approximately $130 or less for full dosing prior to the Class Period) was prohibitively high in lower-tier cities in China where consumers are more price sensitive and have less purchasing power. By the summer of 2022, Merck executives attended meetings where serious concerns about Gardasil in China were raised and discussed, including the need, and struggle, to expand Gardasil sales in lower-tier cities in China.

7.    Shortly thereafter, on August 30, 2022, Merck received a reprieve when China's National Medical Products Administration ("NMPA") expanded the age eligibility for Gardasil 9 among females (from ages 16-26 to 9-45). As explained below, however, that reprieve was short lived.

3

8.      In April 2023, Merck primed the market into believing there were no signs of declining demand in China following the January 21, 2023 extension of the Company's exclusive distribution agreement (the "January 2023 Supply Agreement") with its Chinese distributor, Chongqing Zhifei Biological Products Co., Ltd. ("Zhifei"). The January 2023 Supply Agreement set forth annual base purchase amounts for Gardasil from 2023 through 2026 that reflected a decline in purchase amounts starting in 2025 which could be revised by the parties as needed. When discussing the agreement on Merck's April 27, 2023 Q1 2023 earnings call ("Q1 2023 Earnings Call"), Defendant Davis strongly discouraged the market from interpreting this step-down in purchase amounts as implying any expected "decline in GARDASIL in China over the coming years." Davis further represented that the agreement's base purchase amounts were contractual "minimums" and that Zhifei had consistently surpassed them in years past, thereby raising market expectations that China would continue to serve as a growth engine for Merck's financial results for years to come.

9.      Unbeknownst to investors, by October 2023, demand for Gardasil had flattened and China was no longer a growth opportunity for Merck's HPV vaccine sales. Eligible (age-approved) females in China's most economically developed cities who wanted to and could afford to take Gardasil (*i.e.*, those females who were less price-sensitive) were largely already vaccinated and Gardasil in China was approaching market saturation. Consequently, demand for the vaccine began to decline. Further, Merck's efforts to expand Gardasil sales in less economically developed cities in China were unrealistic due to, among other things, Gardasil's high out-of-pocket cost and the availability of much cheaper domestic HPV vaccines. These undisclosed adverse factors led to excess unsold inventory. Indeed, Gardasil inventory had accumulated at China Centers for Disease Control and Prevention ("China CDCs") and Points of Vaccination ("POVs") to the point where

4

they refused to take additional Gardasil inventory. In turn, inventory was mounting at Merck's distributor, Zhifei.

10. The unsold Gardasil inventory piling up in Zhifei's warehouses meant China was overstocked and not constrained by supply issues. Rather, as a result of the glut of Gardasil doses at Merck manufacturing centers that had been labeled and intended for the Chinese market, Merck sought to offload millions of doses of Gardasil on other countries — an unusual undertaking. The mounting Chinese inventory and decrease in demand also forced Merck, by January 2024, to substantially reduce the Company's 2024 manufacturing plans for Gardasil.

11. The red flags demonstrating that Gardasil in China was no longer a growth opportunity were known or recklessly disregarded by Defendants. Not only was Gardasil touted as a key Merck product and China the lynchpin to drive overall sales growth, Defendants also: (i) admitted publicly that they closely monitored and tracked inventories in China, assuring investors that they had a "good grip and understanding of what's the situation with inventory at POVs, CDC and with our partner Zhifei in China;" and (ii) confirmed that Zhifei and Merck "work[ed] hand in hand" and met as often as weekly to discuss sales strategy, inventory status, and marketing efforts.

12. Rather than disclose the fundamental adverse shift in Merck's most lucrative market for Gardasil, during the Class Period, Defendants artificially inflated the price of Merck securities by repeatedly misrepresenting the state of the Gardasil market in China by, among other things, stating that: (i) the supposed market opportunity among unvaccinated females in the target age cohort would continue to drive Gardasil sales growth in China; (ii) demand for Gardasil outpaced Merck's ability to manufacture it such that Gardasil sales in China were constrained only by Merck's manufacturing capacity; and (iii) none of the material adverse risks associated with

5

the Company's reliance on Gardasil sales in China had materialized when, in fact, they had already materialized.

13.     In coordinated stock trades furthering the scheme alleged herein, the Individual Defendants exploited the Company's artificially inflated stock price by selling Merck shares in February 2024. They profited handsomely from this well-timed trading, with realized collective proceeds of approximately $37 million at Class Period highs of up to $127 per share. Moreover, Defendants Davis and Litchfield sold a significant percentage of their personal Merck stockholdings in these Class Period trades.

14.     Only when Defendants could no longer hide the mounting unsold Gardasil inventory and the saturation of the target female market, in China, did Merck begin to partially reveal that it faced problems in China, disclosing:

(a)     On July 30, 2024, that because of a slowdown in Gardasil sales by its Chinese distributor, the Company's shipments of Gardasil to China in 2024 would likely fall below purported contractual amounts; and

(b)     On October 31, 2024, that it expected Gardasil sales in China to continue declining in 2025.

15.     Despite these disclosures, Defendants continued to mask the true extent of the market's collapse and repeatedly downplayed the severity of the situation. For example, on January 13, 2025, when specifically asked by an analyst about the Chinese "inventory situation" and "how much there was to work through," Defendant Davis deflected and refused to disclose the severity of the issue but rather suggested that it had improved in the third quarter of 2024.

16.     Only three weeks later, on February 4, 2025, Merck announced it was completely ceasing all shipments of Gardasil to China "through at least midyear" 2025, and that Gardasil sales

6

in China were no longer "core" to Merck's growth story. Merck also withdrew the previous expectations it set for the market admitting that "given the uncertain timing of an economic recovery in China," the Company would not reach its $11 billion Gardasil target for 2030.

17. The market reacted strongly to Merck's revelation that Gardasil sales in China were not the growth story as portrayed by Defendants during the Class Period. For example, in the days following Merck's February 4, 2025 disclosure, analysts underscored their surprise and dismay, emphasizing that "Gardasil shocks again," "Gardasil remains an issue & 2025 guide shocks," "Gardasil's issues in China have come to a head," "clearly disappointing," and "the pausing of shipments into China adds more pain & further damages credibility of management." Another analyst likewise expressed their dismay with Merck's management communication regarding the Gardasil decline over the prior six months, noting that: "communication around (and management of) Gardasil has been underwhelming and overshadowed the name. We have now experienced three back-to-back quarters of disappointing results primarily driven by weak HPV vaccine demand in China which understandably frustrates investors and is reflected in the >$100bn market cap erased from MRK."

18. Over the course of the Class Period, Merck's stock price fell from highs above $127 to $90.74 per share on February 4, 2025 — a more than 28% decline. Defendants' fraud caused substantial losses to Merck's investors as they learned the full extent to which the lack of demand for Gardasil in China undermined any reasonable expectation for growth, contradicted claims of supply constraints, and had been adversely impacting Merck from the start of the Class Period.

19. In the months following the end of the Class Period, Merck's Gardasil's sales in China collapsed with absolutely no sales of Gardasil in China in the fourth quarter of 2025, and with no resumption of Gardasil shipments to Zhifei. Notwithstanding that Merck has not shipped

any Gardasil to China for at least one year, Merck's Chinese distributor Zhifei has been left with a crippling inventory problem that continues to this day.

20.     Zhifei's February 2026 announcements leave no doubt that the warning signs of mounting unused inventory were piling up even before the Class Period. It is estimated that Zhifei currently has *15 million doses of unsold Gardasil inventory, eight million doses of which Zhifei is taking an impairment charge on for 2025—worth approximately $1.15 billion*.[2]

21.     Due to its enormous inventory balance (which now represents more than 40% of its total assets) and recent Gardasil price reductions and discounts (including "buy one, get one free" deals), Zhifei is strapped for cash and has applied for billions of dollars in loans. Tellingly, these drastic actions were still insufficient to offset Zhifei's massive aging Gardasil 9 stockpile. The distributor expects to incur a 2025 net loss of *$1.54-$1.98 billion*—marking a *600% drop* from the prior year—stemming from dramatic Gardasil 9 price cuts and substantial inventory impairment charges for Gardasil. Because Gardasil has a three-year shelf life and China CDCs will not purchase vaccines with less than one year remaining, Zhifei's 2025 eight million dose impairment charge likely reflects unsold Gardasil manufactured by Merck in 2023.

22.     As a result of Defendants' fraudulent scheme, wrongful acts and omissions, and the resulting precipitous decline in the market value of Merck securities, Lead Plaintiffs and other members of the Class suffered significant damages.

---

[2] Tianyi Yan, Ziyi Chen & Michael Zheng, *Zhifei (300122.SZ): Preliminary NP largely missed due to inventory/receivable impairments; TP down to Rmb23*, Goldman Sachs (14 January 2026, at 3:27PM CST).

## II.     JURISDICTION AND VENUE

23.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

24.     This Court has jurisdiction over the subject matter of this Action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

25.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b), as Merck is incorporated and headquartered in this District and a significant portion of its business, actions, and the subsequent damages to Lead Plaintiffs and the Class took place within this District.

26.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.     THE PARTIES

### A.     Lead Plaintiffs

27.     Lead Plaintiff AMF is one of the largest pension companies in Sweden. AMF is an institutional investor that invests tens of billions of dollars in assets for the benefit of its approximately 4 million pension customers. AMF had more than $85 billion (USD equivalent) in total pension assets under management as of the end of 2025. As set forth in the Certification previously submitted to the Court (Dkt. No. 13-3), AMF purchased or otherwise acquired Merck common stock at artificially inflated or artificially maintained prices during the Class Period and suffered damages thereby.

28.     Lead Plaintiff KBC is an institutional investor based in Brussels, Belgium that had more than €200 billion in assets under management as of December 31, 2025. KBC serves as the investment management company for KBC Eco Fund NV, KBC Equity Fund NV, Horizon NV, and Plato Institutional Index Fund NV, each of which validly assigned their claims to KBC.  As set forth in the Certification previously submitted to the Court (Dkt. No. 16-3), KBC's funds purchased or otherwise acquired Merck common stock at artificially inflated or artificially maintained prices during the Class Period and suffered damages thereby.

29.     Lead Plaintiff Wayne County is a pension fund that is based in Wayne County, Michigan, which provides retirement services for active, deferred, and retired Wayne County employees, Wayne County Airport Authority employees, and Wayne County 3rd Circuit Court employees. Wayne County represents approximately 8,300 participants (including 5,000 retirees and 3,300 active employees) and is an institutional investor that had more than $1.1 billion in total pension assets under management as of December 31, 2025. As set forth in the Certification previously submitted to the Court (Dkt. No. 16-4), Wayne County purchased or otherwise acquired Merck common stock at artificially inflated or artificially maintained prices during the Class Period and suffered damages thereby.

**B.      Defendants**

30.     Merck is a New Jersey corporation with its principal executive offices located at 126 East Lincoln Avenue, Rahway, NJ 07065. Outside of the U.S. and Canada, the Company does business as Merck Sharp & Dohme or "MSD." During the Class Period, the Company's common stock traded on the New York Stock Exchange (the "NYSE") under the symbol "MRK."

31.     Defendant Davis was, at all relevant times, the President, Chief Executive Officer ("CEO"), and Chairman of the Board of Directors of Merck. During his tenure as CEO, Davis signed Merck's annual reports and certifications pursuant to the Sarbanes-Oxley Act of 2002

10

("SOX") stating that the financial information contained in the Company's financial reports was accurate and disclosed any material changes to Merck's internal controls over financial reporting. Throughout his tenure as CEO, Davis participated in the Company's quarterly earnings conference calls described herein.

32.     Defendant Litchfield was, at all relevant times, an Executive Vice President and the Chief Financial Officer ("CFO") of Merck. During her tenure as CFO, Litchfield signed Merck's annual reports and SOX certifications stating that the financial information contained in the Company's financial reports was accurate and disclosed any material changes to Merck's internal controls over financial reporting. Throughout her tenure as CFO, Litchfield participated in the Company's quarterly earnings conference calls described herein.

33.     Defendant Romanelli was, at all relevant times, President of Merck's Human Health International, which includes profit and loss ("P&L") responsibility for Merck's 75-plus markets outside of the U.S. and overseeing 14,000 employees. As President of Merck's Human Health International, Romanelli reported directly to Defendant Davis. Throughout his tenure as President of Human Health International, Romanelli spoke to financial analysts and participated in various conferences on the Company's behalf. From 2016 through July 2021, Romanelli was Managing Director, MSD China. According to Merck's website: "During his tenure in China, Merck became the second largest multi-national pharmaceutical company by revenue in the market, as well as the second largest subsidiary for the company globally."

34.     Defendant Oosthuizen was, at all relevant times, President of Merck's Human Health U.S. division, which is Merck's largest business division focused on human medicines and vaccines. In this position, Oosthuizen reported directly to Defendant Davis. He is responsible for P&L, strategy, customer engagement, and commercialization in the U.S. Throughout his tenure as

11

President of Merck Human Health U.S., Oosthuizen spoke to financial analysts and participated in various conferences on the Company's behalf.

35.    The Individual Defendants possessed the power and authority to control Merck's course of business as well as the contents of Merck's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Merck's SEC filings and press releases, alleged herein to be misleading prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Merck and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions, and fraudulent scheme and course of conduct pleaded herein.

## IV.    RELEVANT NON-PARTIES MENTIONED IN COMPLAINT

### A.    Additional Merck Executives

36.    Anna Van Acker ("Van Acker") served as President of MSD China from late 2021 through May 2025. On May 30, 2025, Merck announced that Van Acker would step down from her role as President of MSD China and transition to a management role within the Human Health Division based in Europe, where she would dually report to Defendant Romanelli (who preceded Van Acker as President of MSD China) and Chirfi Guindo, Chief Marketing Officer at Merck.  As President of MSD China, Van Acker was responsible for leading the Company's operations and strategy in the Chinese market and overseeing Merck's relationship with Zhifei.

**B.      Confidential Witnesses**

37.      This Complaint references former employees of Merck that support Lead Plaintiffs' allegations herein.

38.      CW-1 was employed by Merck in a functional capacity with responsibility for Asia, including China, from before the Class Period and for several months of the Class Period. CW-1 advised that in this role, he was responsible for providing global strategies for the Asia Pacific region, including China, and served as a liaison between the Commercial team and a team referred to as a functional team. CW-1 offered advice to these regions on how to raise parental awareness of vaccinations and how to explain gender neutral vaccines. Prior to this role, CW-1 served in other roles related to vaccines.

39.      CW-2 was employed by MSD Latin America from before the Class Period through the end of the Class Period.  From mid-2023 to mid-2024, CW-2 was in a regulatory and policy position and then from mid-2024 through the end of the Class Period, he was a lead HPV Specialist with responsibility for two LATAM countries.

40.      CW-3 worked as an Operations Manager at various Merck facilities before and during the Class Period. Leading up to the Class Period until Spring 2024, CW-3 worked at Merck's manufacturing facility in Elkton, Virginia.

41.      CW-4 served as a director in Business Development at Merck's headquarters in Rahway, New Jersey from before the Class Period until May 2024. In this role, CW-4 reported to Senior Vice President Manufacturing Strategy, Business Development, Alliances, Shared Services, Network & Third-Party Sales, who reported to Sanat Chattopadhyay, EVP & President, Manufacturing, who reported to CEO Davis. CW-4's responsibilities included developing business and manufacturing partnerships for a number of vaccines including Gardasil and Gardasil 9.

42.     CW-5 was employed by Merck in a U.S.-based managerial position involving planning for Gardasil production, from before the Class Period through the end of the Class Period. During his tenure, CW-5 worked closely with Merck's Supply Chain Management (SCM) teams, and annually reviewed Gardasil Pre-Marketing Commitments (PMCs). CW-5 confirmed that, during his tenure, at least one member of the SCM team reported directly to a Senior Executive reporting to CEO Rob Davis.

## V.     RELEVANT BACKGROUND

### A.     Gardasil's Approval as an HPV Vaccine

43.     HPV is the main cause of cervical cancer and one of the most common sexually transmitted viruses in the world. Vaccines have proven to be an effective intervention to reducing HPV infections. Merck developed Gardasil 2 and Gardasil 4 as HPV vaccines that were approved for use by the U.S. and the European Union in 2006. Gardasil 2 is a bivalent HPV vaccine, guarding against HPV types 16 and 18 and Gardasil 4 is a quadrivalent HPV vaccine, providing coverage against four HPV types: 6, 11, 16, and 18, as well as genital warts.

44.     In 2014, Gardasil 9 received the U.S. Food and Drug Administration approval. Gardasil 9 was the first vaccine capable of protecting against nine types of HPV infection: 6, 11, 16, 18, 31, 33, 45, 52, and 58, and genital warts caused by HPV types 6 and 11.

45.     In China, while Merck filed for regulatory approval of Gardasil 4 with the NMPA in 2010, it was not approved until about seven years later in May 2017. At the time, Gardasil 4 was approved for women aged 20-45 in China, making Gardasil 4 the first approved quadrivalent HPV vaccine in the country.

46.     Approximately one year later, in 2018, the NMPA approved Gardasil 9 for females aged 16-26. On August 30, 2022, China expanded the age cohort approved for Gardasil 9 from females aged 16-26 to 9-45.

**B.     Driven by Sales in China, Gardasil was Key to Merck's Business**

47.     In the years leading up to the Class Period, Merck increasingly relied on Gardasil sales in China to power the Company's overall revenue and growth. Gardasil sales grew modestly from $1.7 billion in 2014 to $3.2 billion in 2018, constituting only approximately 7.5% of Merck's revenue in 2018. With the approval of Gardasil in China in 2017, and its subsequent launch, Gardasil's sales growth rate for 2018 was 3.7 times higher than its average sales growth rate for the preceding three years.

48.     In 2021 and 2022, Merck's vaccine division reported $5.7 billion and $6.9 billion in Gardasil sales, respectively.

49.     By 2023, Gardasil solidified itself as one of the Company's "key products," becoming second only to Keytruda (Merck's immunotherapy cancer medication) in overall sales. Gardasil and Keytruda sales represented 56% of Merck's total sales in 2023, with Gardasil sales of $8.9 billion.

50.     Defendants repeatedly reinforced Gardasil's importance to Merck as a growth driver of the Company's financial performance. For example:

(a)     On October 27, 2022, in response to a question during Merck's Q3 2022 earnings call ("Q3 2022 Earnings Call"), Defendant Litchfield stated: "GARDASIL continues to be a very strong growth driver for our company;"

(b)     On January 9, 2023, during the 41st Annual J.P. Morgan Healthcare Conference, Defendant Davis stated: "We've talked about starting with the vaccines business, which is really anchored in our product, GARDASIL, that that product will continue to grow meaningfully. And in fact, we expect it to more than double off of 2021 sales. So that – if you look forward, what that means is growth in excess of $11 billion by 2030;"

15

(c)     On February 24, 2023, Merck's 2022 Form 10-K filed with the SEC and signed by Defendants Davis and Litchfield, stated: "The Company's ability to generate profits and operating cash flow depends largely upon the continued profitability of the Company's key products," including "Gardasil/Gardasil 9;"

(d)     On April 3, 2023, Merck's 2023 Proxy Statement noted: "Our vaccines business remains a key growth pillar, anchored by our HPV vaccines GARDASIL and GARDASIL 9. We expect our HPV vaccines to continue growing substantially, potentially more than doubling 2021 sales and generating over $11 billion in revenue by 2030;" and

(e)     On November 21, 2024, at the Jefferies London Healthcare Conference, Defendant Romanelli stated that Gardasil became "the biggest product outside the US for any company in any one market."

51.     Merck heavily relied on the Chinese market for Gardasil to drive growth. Each of Merck's quarterly earnings presentations for 2022 and 2023 featured slides underscoring that Gardasil led Merck's overall vaccine sales because of demand from the Chinese market.

(a)     Also, on July 30, 2024, Defendant Davis emphasized during Merck's Q2 2024 earnings call ("Q2 2024 Earnings Call"), that Merck's Gardasil sales to China represented "about 60% to 70%" of all Gardasil sales outside the United States.

(b)     Similarly, on August 5, 2024, following a discussion with Defendant Romanelli, Goldman Sachs' analysts reported that Gardasil sales to China made up about 50% of Merck's total Gardasil sales, with the U.S. contributing around 20% of sales, and the remaining 30% of sales coming from other international markets.

16

C.      **Merck Focuses on Selling Gardasil in China's Wealthier Cities**

1.      **Gardasil Costs Several Times More than Its Competition And is Sold Only in the Private Market**

52.      Merck's target segment in China was the "private market" or "private segment" because it was not included in China's national vaccination program and thus required private individuals to pay out-of-pocket for the vaccine. Because Gardasil was extremely costly, it was perceived as a premium or luxury product in China, and it was economically unfeasible for many eligible females in the age cohort to take it, including college students and those in less socioeconomically developed regions of the country.

53.      When Gardasil 4 and Gardasil 9 first launched in China in 2017 and 2018, respectively, Merck faced little meaningful competition in the private market. As a result, Merck could get away with the premium it charged for them — prices well above, and sometimes quadrupling, its HPV vaccine competitors' prices. For example, when it launched in 2018, Merck charged the Chinese equivalent of approximately $185 per dose for Gardasil 9 (as opposed to Cervarix, GlaxoSmithKline's bivalent option, which cost approximately $85 per dose in China in 2018) — resulting in approximately $580 spent out of pocket per individual.

54.      By the start of the Class Period, two additional HPV vaccines were approved for marketing in China in addition to Cervarix and Gardasil: two bivalent competitors manufactured locally in China, Cecolin, manufactured by Wantai BioPharma, and Walrinvax, manufactured by Walvax BioTechnology, launched in 2019 and 2022, respectively. At the start of the Class Period, the competition charged as little as $43 per dose. But, throughout the Class Period, the prices of competitor bivalent HPV vaccines in China continued to fall. With more affordable options, Merck faced increased competition for sales in the private market, especially in less socioeconomically developed regions of the country.

17

**2.    Because of Gardasil's High Price, Merck's Market was China's Wealthier Cities Where the Company Faced Less Competition**

55.    China's cities are commonly categorized into multiple tiers according to each city's level of economic development and influence. Tier 1 city residents generally have the highest purchasing power in China and the highest health awareness of the Chinese population. This generally decreases with each tier; for instance, an individual's disposable monthly income generally decreases as the city tier increases.

56.    As such, Merck prioritized Tiers 1 and 2 cities for Gardasil distribution because eligible residents in these areas possessed the greatest purchasing capacity, willingness, and overall interest in vaccinating against HPV with Gardasil. Even within these cities, Gardasil's cost of approximately $580 for the three-dose schedule was a significant expense for eligible females and parents of eligible females: average disposable monthly income totaled less than approximately $770 in Tier 1 cities and approximately $480 in Tier 2 cities. The cost became increasingly prohibitive in lower-tier cities, with Tier 5 cities having an average disposable income of less than approximately $275.  Thus, consumer spending in China's lower-tier cities is disproportionately sensitive to the country's macroeconomic conditions.

57.    Additionally, local governments in some lower-tier cities (like Fujian, Jiangxi, Sichuan, Shandong) ran free HPV vaccination campaigns or partial subsidies for HPV vaccines, including Cecolin, primarily for girls ages 9–14. Gardasil was never included in these free or discounted vaccine programs.

58.    Merck sought to differentiate itself from its cheaper competition and maintain its growth story during the Class Period by representing that it was successfully targeting eligible individuals in Tier 1 and 2 cities, stating that it had achieved approximately 40% penetration for eligible females. Meanwhile, Merck stated that the competition was focused on lower-tier cities.

18

59.     The Company routinely admitted it was incredibly difficult to market and sell Gardasil in China's lower-tier cities where it faced local competition and much cheaper HPV vaccine alternatives. For example:

(a)     On February 1, 2024, during Merck's Q4 2023 earnings call (the "Q4 2023 Earnings Call"), Defendant Davis emphasized that Gardasil was not realistically marketable to the poorer citizens in China's lower-tier cities, which were dominated by domestic competition but assured investors "that does not change our view of the growth potential in China:"

> So, there's actually been Chinese competitors with an offering for some time actually in the Chinese market, and that market is large. We continue to believe in the eligible cohorts in just the urban females, which is the Tier 1 to Tier 3 cities, is about 200 million – a little over 200 million women. And so, of that, we think probably about 30% have actually received vaccination. So, you're still looking at 120 million, 130 million eligible population.
>
> *As we look at this and as we've seen over time, we continue to be very competitive. We're maintaining a vast majority of share in the private market, and really you're seeing most of the local competitors go to the lower tier cities and to a different population than we've been targeting.* So, that does not change our view of the growth potential in China. Long-term, obviously, we will continue to face competition there, and we are positioning ourselves to continue to succeed there. But the approval you're talking about [a 2-dose regimen for Gardasil] is not changing our view.

(b)     Similarly, on May 15, 2024, during the Bank of America Healthcare Conference, Defendant Litchfield reiterated Merck's focus on selling Gardasil to the well-off individuals in China: "As it pertains to China, China is a large market, and today, we are approved in girls *and are addressing people who have the affordability to pay for the vaccine out of their pocket*."

(c)     On July 30, 2024, during Merck's Q2 2024 Earnings Call, Defendant Davis emphasized that Gardasil was limited to the private market comprised of affluent citizens in China's top-tier cities:

19

When we quote the 200 million total females of which we would say we're 30% to 40% penetrated today, that's really in the Tier 1 to 5 cities that we think can afford a cash pay market. The total population accessible in China is much bigger. And so I don't think we should assume we're all competing for that small slice. There's a much bigger slice. *We have chosen not to go for that bigger piece because, obviously, we can't get into the local vaccination program because we don't produce GARDASIL in China. Our competitors will be able to do that.* So I think I would just caution all to not view it as a zero-sum game. *I think there's still a market expansion opportunity in China that will benefit* both *us* and the competitors. And, frankly, the other thing we have to see is how quickly will the male indication be given to others beyond us. We believe there's a chance we could be sitting alone with that as well.

(d)    On November 21, 2024, during the Jefferies London Healthcare Conference, Defendant Romanelli underscored Merck's long-standing knowledge that China's lower-tier cities would pose challenges for Gardasil but nevertheless continued to tout Gardasil's sales in China as a driver of growth:

[N]ow you go back to China, we launched G4 in 2017, had a fantastic launch. It was so accelerated that we then without Phase 3 data launched G9 in 2018. . . . Over that time, we knew that we would get to the bolus of female patients.

. . . .

And we vaccinated roughly 50 million. Now, there's still a pretty big cohort. *A lot of that is occurred in the Tier 1, Tier 2 cities where we have fairly high VCR rates, 40% to 50% depending on the city and 90% to 95% market share.* So, *we always knew that at some point, we would start to trail off as we expand into Tier 3, Tier 4, Tier 5 cities* and we would bring in the male indication.

60.    Thus, once Merck saturated the market for Gardasil in China's higher-tier, more economically developed regions, it was not realistic for the Company to sustain prior demand levels as it tried to expand into China's lower-tier, less economically developed regions where stiff competition and affordability issues were more pronounced.

20

**3.    Merck Assures Investors That Because It Operates in the Private Segment, China's Economic Slowdown Was Not Affecting Gardasil Sales**

61.    Merck claimed that because its Gardasil business was confined to the private market, which did not rely on public government funding, shifting macroeconomic conditions such as China's economic slowdown and the Chinese government's anti-corruption investigation into the healthcare industry would not dampen Gardasil sales.

62.    For example, on November 8, 2023, during the UBS BioPharma Conference, Defendant Oosthuizen represented that:

> Trung Huynh [UBS]: Yeah. Okay. And perhaps an unfair question because you're President of Human Health in the US, but China, Merck is one of the bigger players in China. We've seen a significant slowdown in the Chinese economy there. Have you seen any kind of impact to Merck? And there's also crackdown on regulations.
>
> Oosthuizen: Yeah. I mean, on the anti-corruption drive, we think that's a good thing for business. I think that's — and my counterpart, Joe Romanelli, who actually managed China, now is leading international do believe that that will help to create an even playing field, which we think is good for business but it's also good for patients, right, that decisions are made in the interest of what is best for patients and not for any other reason.
>
> So, in terms of the economic slowdown, I mean, that's been ongoing for a while. We haven't seen it in our business for the most part because our business is pretty much in the private segment. So it's less affected by public funding, government spend and I think it's also indicative of the value that KEYTRUDA as well as GARDASIL, in particular, bring to the Chinese population as well as JANUVIA in terms of diabetes. But our business is mostly in the private segment, so less affected, I guess, by government constraints at this point.

63.    However, at this time, Merck was observing red flags demonstrating that the Gardasil market in China had reached a saturation point and Gardasil growth would not continue.

**D.    Zhifei Exclusively Markets and Distributes Gardasil in China**

64.    Zhifei, primarily a pharmaceutical distributor and a recent pharmaceutical developer itself, has served as Merck's exclusive distribution agent for vaccines in China since

2011. Through their collaboration, Zhifei imports, sells, and promotes a host of Merck vaccines, with Gardasil being the most important by overall sales and product volume.

65.    Merck manufactures Gardasil in various locations, including the U.S. and Ireland, and recognizes revenue for its Gardasil sales to China upon shipment to Zhifei.

66.    Upon Zhifei's receipt of Gardasil, the NMPA examines and tests each shipment (*i.e.*, batch) of Gardasil in accordance with the Vaccine Administration Law of the People's Republic of China — a quality control process that takes approximately three months. Once a batch passes inspection, the NMPA issues a "lot" release certificate with a "lot" identification number and publishes lot release data on a weekly basis via its website. Zhifei also publishes the number of doses granted release by NMPA via semi-annual reports in English.

67.    Zhifei warehouses the approved Gardasil until China CDCs place purchase orders for the Gardasil. China CDCs, of which there are about 3,000, then distribute doses to POVs, (*i.e.* clinics) where the vaccine is ultimately administered to individuals.

68.    Generally, China CDCs maintain approximately three months of inventory at any given time, while POVs maintain approximately one month of inventory.

69.    CW-1 explained that Zhifei managed the sale of Gardasil at the official points of vaccination (POV) in China.

### 1.    December 2020 Supply Agreement

70.    The commercial relationship between Merck and Zhifei is governed by a supply/distribution agreement, which has been modified over the years to reflect changing market dynamics.

71.    On December 23, 2020, Merck and Zhifei entered into a new Supply, Distribution, and Joint Promotion Agreement for the exclusive import, promotion, and distribution of vaccine products for which Merck had already received marketing authorization in mainland China,

including Gardasil 4 and 9 (the "December 2020 Supply Agreement"). Merck was also permitted to conduct national or regional promotional activities for the subject vaccines at its own expense.

72.    For each vaccine, the agreement set forth annual "Base Purchase Amount" (in billion Chinese Renminbi ("RMB")) for Zhifei. For Gardasil, these purchase amounts progressively increased from the start of 2021 through the first half of 2023 and allowed Merck and Zhifei the ability to modify Zhifei's purchases based on actual demand.

### 2.    January 2023 Supply Agreement

73.    On January 21, 2023, before the expiration of the December 2020 Supply Agreement, Merck and Zhifei renewed and extended the agreement (the "January 2023 Supply Agreement").

74.    The renewed agreement detailed new Base Purchase Amounts for Merck's vaccines from 2023 through 2026 and allowed Merck and Zhifei to mutually revise the Base Purchase Amount based on market conditions:

| Year / Half-Year | Base Purchase Amount of Gardasil (Billion RMB) |
|---|---|
| H2 2023 | 21.41 |
| 2024 | 32.63 |
| 2025 | 26.03 |
| 2026[3] | 17.89 |

75.    Leading up to the Class Period, on April 27, 2023, during Merck's Q1 2023 Earnings Call, Defendant Davis was specifically asked about Zhifei's declining contractual purchase amounts starting in 2025 in the January 2023 Supply Agreement. In response, Davis minimized the contract's declining purchase structure and discouraged the market from interpreting the Base Purchase Amounts to imply "a decline in GARDASIL in China over the

---

[3] While conversion rates varied over the life of the deal, in USD, the agreement amounted to approximately $4.5 billion in 2024, $3.6 billion in 2025, and $2.5 billion in 2026.

coming years." Davis further noted "that the levels put in that contract are minimums[,]" without disclosing that these purchase amounts were not binding purchase orders and could be renegotiated. This exchange went as follows:

> Tim Anderson [Wolfe Research]: Thank you. I have a question on GARDASIL in China. So the Zhifei contract from your Chinese distributor published a couple of months ago shows really big purchase orders consistently for the next few years and then it kind of trails off and declines. And if interpreted literally, it could suggest there's kind of a bolus effect going on, where growth isn't linear, it goes up for a while, then it contracts as you work your warehouse patients. ***Is that how we should think about the longer-term uptake of GARDASIL in that particular market, that it might not be linear?*** Thank you.

> Davis: Just ***so if you look at the Zhifei contract, it's important to understand that the levels put in that contract are minimums.*** And in fact, we have shown and our history has been that actually ***we have supplied well over the minimum. So I wouldn't interpret that as the literal forecast of the business in China,*** because there are opportunities with the expanded age cohorts as we continue to drive penetration in what is still a large unmet population. ***There is opportunities to do better than what's in that contract. And if history is indicative of the future, we would expect to see that move forward.  So I would not interpret that as implying a decline in GARDASIL in China over the coming years.***

76.     During the Class Period, Defendants maintained that sales of Gardasil would be driven by China and failed to correct the misimpression that Defendant Davis created — namely, that the contracted "minimum" Base Purchase Amounts were guaranteed and that decreasing Base Purchase Amounts in the January 2023 Supply Agreement did ***not*** "imply[] a decline in GARDASIL in China over the coming years." It was not until July 30, 2024, that Defendants began to clarify that: (i) Zhifei was not, in fact, required to adhere to the Base Purchase Amounts; and (ii) Merck structured these purchase amounts to decline in the future specifically because Defendants "always" expected the Chinese female market for Gardasil to hit a saturation point and then fall off.

24

## VI.    OVERVIEW OF THE FRAUD

### A.    Red Flags in China Belie Merck's Stated Drivers of Growth

77.    Leading up to the Class Period, China's Tier 1 and 2 cities approached market saturation because the women willing and able to pay premium prices for Gardasil in those locales had largely been vaccinated. And, despite internal adverse information that undermined any material expansion of Gardasil sales in lower-tier cities to offset that saturation, Defendants continued to publicly represent that Gardasil sales in China presented a significant growth opportunity.

78.    CW-1 explained that by Summer 2022, Merck's Gardasil sales in Tier 1 cities in China was reaching capacity. CW-1 stated that Merck knew that in order to keep Gardasil sales growing in China, it was going to have to expand sales to Tier 2 and Tier 3 cities, which the Company was concerned about.

79.    According to CW-1, Merck was "struggling" with its strategy to grow Gardasil sales in second tier cities in China.

80.    CW-1 reported that he attended meetings at Merck's offices outside of Shanghai, China in June or July 2022 where "serious" concerns about Gardasil in China were raised and discussed, including geographic expansion in China.  CW-1 confirmed that Anna Van Acker, former President and Managing Director of MSD China, also attended these meetings, along with high level employees from Merck's corporate headquarters in the United States and from the Marketing department. CW-1 detailed that Merck invited a third-party consultant to these meetings who described trends in Chinese consumer behavior that could impact multinational corporations operating in China, such as Merck. CW-1 stated that in this meeting the consultant outlined that Chinese consumers were changing their spending behaviors and were beginning to prefer local products over multinational products. CW-1 explained that this consultant also told attendees that

Chinese consumers were becoming more cost conscious and no longer viewed multinational brands as superior to local alternatives. CW-1 added that this consultant presented some visuals to aid in the presentation. After this discussion with the consultant, Merck internally met and discussed how the consultant's remarks would affect marketing of and demand for Gardasil in China.

81. CW-1 stated that another concern raised during these meetings in June or July 2022 was local competition. According to CW-1, Merck knew that China was developing its own HPV vaccines, including a 9-valent HPV vaccine. CW-1 detailed that Merck knew that competition from domestic low-cost HPV vaccines in China was emerging and therefore the Company should have been prepared for a significant drop in Gardasil sales in China.

82. CW-1 noted that he began telling his colleagues, including functional and Commercial colleagues, in 2022, that Merck's Gardasil runway in China was "going to end sooner than later." CW-1 explained that he anticipated this for the following reasons: 1) Chinese consumers' trust in local vaccines was increasing; 2) China had developed its own bivalent and quadrivalent HPV vaccines which were cheaper than Gardasil and a Chinese manufactured 9-valent HPV vaccine was "coming online"; and 3) Chinese consumers were more cost conscious due to the economy.

83. Thus, by the first half of 2023, Merck increased the size of its sales and marketing teams in China to attempt to generate interest in Gardasil amongst China's lower-tier cities.

84. Simultaneously, Merck increased its Gardasil shipments to China. Management reported to BMO Capital Markets analysts in April 2023 (as reflected in an April 27, 2023 report) that Merck "had a pull forward in shipments into the first half which was roughly $200M in demand. We do expect acceleration of growth in 2023 relative to 2022." On August 1, 2023, BMO

Capital Markets analysts again reported that Merck's management had pulled the $200M "forward for Chinese Gardasil to increase supply."

85. However, unbeknownst to investors, Merck shipped more Gardasil in the first half of 2023 than its distributor could possibly sell. By the second half of 2023, demand for Gardasil in China was waning as reflected in the build-up of unsold inventory that was accumulating in Merck's distributor's warehouses and the slowdown in sell-through of Gardasil at the China CDCs and POVs.

(a) In August 2023, Zhifei reported in a 2023 Interim Business Performance report that its inventory had already risen 3,354,293,979 RMB, or roughly $485 million USD, from the end of 2022 referencing "product procurement" as the reason.

(b) Zhifei's 2024 Business Performance report, dated April 2025, admitted that Zhifei's inventory as a percentage of total assets ballooned from 8,986,023,821 RMB to 22,218,088,029 RMB – nearly 27% (from 17.89% in "*[e]arly 2023*" to 44.52% at the "[e]nd of 2024") – *an increase of an astonishing* 13,232,064,208 RMB or *roughly $2 billion dollars*.

86. After the Class Period, it was revealed that a portion of this unsold inventory was from 2023. On February 5, 2026, Finance BigGo reported Zhifei's admission that its sales of HPV vaccines were negatively impacted by competing domestic products and market saturation. As a result, Zhifei was forced to take a "massive inventory write-down" to address the unsold inventory. To that end, Zhifei "made substantial provisions for inventory impairment for products nearing or at their expiration dates due to changes in market demand." The inventory "is set to reach its expiration date in 2026." Because Gardasil has a 3-year shelf life, this means that this unsold inventory was likely mounting since 2023.

1.    **The Lack of Demand and Slowing Sales of Gardasil in China Force Merck to Move Millions of Gardasil Doses Intended for China Into Other Geographical Regions**

87.    By the fall of 2023, the level of Gardasil inventory in China remained high and Merck was forced to unload additional Gardasil inventory manufactured for China on other markets. Defendants knew that with demand waning in China for Gardasil and with the vaccine's three-year shelf life, unused doses would become unsaleable in the channel even before expiration. Thus, Defendants tried to find other countries that would take the vaccine.

88.    CW-2 recalled attending a virtual meeting in October or November 2023, which was led by Merck's Global Commercial and Marketing teams. According to CW-2, the Global Commercial and Marketing teams explained to attendees at this virtual meeting that China was overstocked with Gardasil 4 and Gardasil 9 because Merck over forecasted customer demand for Gardasil in the Chinese market. CW-2 stated that it was mentioned in the meeting that Merck sold fewer Gardasil vaccines in China than projected. CW-2 stated that the Global Commercial and Marketing teams told attendees that China needed to get rid of a lot of Gardasil 4 and Gardasil 9 units and required the help of other markets in order to do so. CW-2 noted that China needed to move more than four million units of Gardasil in October or November 2023 because China requested the assistance of multiple LATAM countries in addition to Brazil.

89.    CW-2 noted that the Gardasil vaccines that were being offered to LATAM countries from China had Chinese labels on them. CW-2 also stated that Gardasil 9 was offered at a discount because China has an excess of Gardasil at that time and needed to unload it.

90.    CW-2 noted that the Global Commercial and Marketing teams stated during this meeting that they were asking all global markets to acquire Gardasil 4 and Gardasil 9 units from China. CW-2 stated that the October or November 2023 meeting was the only time during his

tenure that it was proactively communicated that Gardasil manufactured for one region was available to be distributed to other regions.

91. Following Merck's partial disclosure of certain issues with demand in China on July 30, 2024, Defendant Romanelli acknowledged at the Bank of America 2024 Global Healthcare Conference on September 18, 2024, that Merck "could" ship excess Gardasil doses meant for China to other countries: "So we always look at demand first and foremost. Because if I think about the recipe for GARDASIL in China, it's very similar to the recipe in other markets. So I could ship those doses to other markets." However, Defendants failed to disclose that Merck had done just that one year earlier due to excess Gardasil inventory sitting in China and waning demand.

### 2. Recognizing that China Was No Longer a Growth Opportunity for Gardasil, Merck Ramps Down Gardasil Manufacturing Plans for 2024

92. By the start of the Class Period, Merck knew, as a result of inventory build-up and lack of demand, that selling Gardasil to China no longer presented a viable growth opportunity. As a result, and as described by one of Merck's former Operations Managers, Merck was forced to deviate from its original 2024 Gardasil production plan and reduce its manufacturing of Gardasil.

93. CW-3 explained that while he worked at the Elkton, Virginia facility, he oversaw the manufacturing of alum specifically for Gardasil 9. CW-3 explained that alum is one of many components used to make Gardasil and is specifically used to elicit the HPV vaccine's immune response. CW-3 noted that alum went into a lot of vaccines during his tenure, but he estimated that 80% of alum produced by Merck was specifically for the manufacture of Gardasil 9.

94. CW-3 confirmed that the Elkton facility manufactured alum for Gardasil customers domestically and internationally. CW-3 stated that although the Elkton facility produced alum for

all Gardasil markets, China was the largest Gardasil market during his tenure. CW-3 estimated that the Elkton facility manufactured the "lion's share," or at least 60%, of Merck's total alum produced in 2024. CW-3 confirmed alum also was manufactured at Merck's Durham, North Carolina and West Point, Pennsylvania facilities.

95.    CW-3 explained that alum production forecasts came from Marian Phelan, current Executive Director, ExM Global SCM Lead, who passed them down to Martyna Jezewska, Director of Operations – Gardasil Integrated Process Team, who in turn passed them down to CW-3's team.

96.    CW-3 confirmed that at the end of 2023 forecasts for the Chinese Gardasil market in 2024 were "up in the air." CW-3 explained that in Q4 2023, the Elkton facility did not have its final 2024 alum batch projections because Merck was still attempting to forecast Gardasil 9 demand in China in 2024.

97.    CW-3 recalled that the initial plan was for the Elkton facility to ramp up alum production in 2024. However, CW-3 noted that discussions about ramping down alum production in Elkton in 2024 took place in late 2023 due to changes in the Gardasil 9 Chinese market.

98.    CW-3 detailed that things were "volatile" in November or December 2023 because the Elkton facility did not know if it was going to follow through on ramping up, as originally planned, or reducing alum production in 2024. According to CW-3, the Elkton facility learned in November or December 2023, that Gardasil 9 inventory in China was increasing and that demand for Gardasil 9 in China was declining. CW-3 stated that the Elkton facility also learned in November or December 2023, that China did not use as much Gardasil 9 in 2023 as initially projected.

99.    CW-3 confirmed that in February or March 2024, Martyna Jezewska, Director of Operations - Gardasil Integrated Process Team, led a meeting about alum forecasts. CW-3 detailed that this meeting was attended by associate directors of quality, operations and technical operations. CW-3 detailed that this meeting was a "special meeting" that occurred offsite and was held to exclusively discuss Gardasil 9 projections for the next 6-to-12 months.

100.    According to CW-3, Jezewska told attendees that in January 2024, Merck had lowered the annual projection of 190 batches of alum to be produced in Elkton in 2024 to approximately 130 batches of alum due to a "significant" decline in demand for Gardasil 9 in China. CW-3 reiterated that Jezewska told attendees in this meeting that Merck initially expected China to require a certain amount of Gardasil 9 in 2024, but Merck's headquarters received information from China that the Chinese market required significantly less Gardasil 9 than Merck initially projected it would need, and therefore, Merck overestimated the amount of Gardasil 9 that China required in 2024.

101.    According to CW-3, Merck's headquarters relayed this information about decreased demand for Gardasil 9 in China to the Elkton facility and told the facility to revise and decrease significantly its alum batch manufacturing forecasts as a result.

102.    CW-3 explained that one batch of alum went into a few thousand vials of Gardasil, and by lowering the number of alum batches produced in 2024 from 190 to 130, the Company was significantly lowering the number of Gardasil 9 vials to come to market in 2024. CW-3 added that alum has a shelf life of 12 months and therefore the alum batches produced in 2024 were expected to be used later that same year, depending on how much alum supply the Company had on hand.

31

**B.      The Lack of Demand for Gardasil in China Results in Millions of Doses of Gardasil Inventory Stockpiled at Zhifei**

103.    As discussed above, the NMPA significantly increased the Chinese population eligible for Gardasil 9 in August 2022 by widening the approved female age cohort for Gardasil from 16–26-year-olds to 9–45-year-olds. Based on this increased female age cohort in China, Merck dramatically increased Gardasil supply to Zhifei through Q2 2023. But by the Fall of 2023, China was no longer a viable driver of growth for Gardasil as reflected in unsold doses and witness accounts. According to data shared by Zhifei, the NMPA released 46.9 million Gardasil doses in 2023, but Zhifei sold only 27 million doses of Gardasil that year.[4] Consequently, Zhifei entered 2024 with a significant surplus of Gardasil of at least ten million doses. Yet conditions continued to deteriorate and the warning signs that Merck observed leading up to and at the start of the Class Period were soon after reflected in Zhifei's performance.

104.    Zhifei's Gardasil sales plummeted in January 2024 on a month-over-month basis. By the end of Q1 2024, Zhifei's Gardasil sales to China CDCs were significantly lower than previous quarters. Additionally, during Q1 2024, Zhifei's Gardasil inventory levels significantly increased on a quarter-over-quarter basis.[5]

105.    Merck's 2024 Form 10-K, filed with the SEC on February 25, 2025, described the collapse of the Gardasil market in China:

---

[4] As set forth herein, upon Zhifei's receipt of Gardasil, the NMPA examines and tests each shipment (*i.e.*, batch) of Gardasil and issues a "lot" release certificate with a "lot" identification number and publishes lot release data on a weekly basis via its website. ¶66.

[5] This section's allegations concerning Zhifei's Gardasil sales and Gardasil inventory movements in 2024 are derived from charts published after the Class Period by the following analysts: (1) Evercore ISI report published on April 24, 2025 and titled "China tariff = $200M impact; Q1's one-timers are well known;" (2) UBS report published on May 21, 2025 and titled "China Healthcare APAC Focus: Vaccines – a tale of two markets;" and (3) UBS report published on July 17, 2025 and titled "China Vaccine H125 preview: fundamentals continue to diverge."

> The Company's business in China has grown in the past few years, and the importance of China to the Company's overall pharmaceutical and vaccines business has increased accordingly. . . . [T]he Company shipped less than its contracted doses to Zhifei in the latter part of 2024. Lower demand in China persisted and, at the end of 2024, overall channel inventory levels in China remained elevated at above normal levels. Therefore, the Company made a decision to temporarily pause shipments to China beginning in February 2025 through at least the middle of the year and as a result, combined sales of Gardasil/Gardasil 9 will decline significantly in 2025 compared with 2024.

106.    Over the rest of 2024, Merck's Gardasil business in China unraveled, with each subsequent quarter worse than the preceding one. During each of Q2, Q3, and Q4 2024, Zhifei's Gardasil inventory continued to rapidly increase, and sales in the Chinese market further deteriorated.

## VII.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

107.    Lead Plaintiffs allege that the statements *identified in bold and italics* within this section were materially false and misleading, because, among other reasons, they omitted to disclose material information of which Defendants were aware or were reckless in not knowing. As alleged herein, such statements — along with Defendants' fraudulent scheme and course of conduct — artificially inflated or artificially maintained the price of Merck securities and operated as a fraud or deceit on all persons and entities that purchased or otherwise acquired those securities during the Class Period. Because Defendants chose to speak on the issues described below, and thereby put these subjects into play, Defendants had a duty to fully, completely, and truthfully disclose all material facts and information regarding these issues. As described below, Defendants created an impression of a state of affairs at Merck that differed in a material way from the one that actually existed.

33

108.    Lead Plaintiffs have categorized Defendants' false and misleading statements below as follows: (i) "Gardasil Growth Statements;" (ii) "Gardasil Supply Constraint Statements;" (iii) "Gardasil Risk Disclosure Statements;" and (iv) "Gardasil Stepdown Statements."

**A.    Defendants' Materially False and Misleading Gardasil Growth Statements**

**1.    Q3 2023 Earnings Call (October 26, 2023)**

109.    On October 26, 2023, before the market opened, Merck announced its Q3 2023 financial results. That same day, Merck also hosted its earnings call for its third quarter 2023 financial results ("Q3 2023 Earnings Call"), during which Defendants Davis and Litchfield, among others, participated.

110.    During the question-and-answer segment of the Q3 2023 Earnings Call, Defendant Davis touted the growth potential of Gardasil. Davis asserted that Merck remained "very confident" that Gardasil sales would reach "$11 billion in revenue by 2030" and touted Gardasil's ability to continue its strong growth pattern in China:

> Chris Schott [J.P. Morgan]: Great. Thanks so much. I just had a question on GARDASIL. We've seen obviously some very impressive growth over the past few years. But looking ahead, I'm just interested in how much more opportunity for – you see for this franchise to ramp from here. So, maybe just elaborate a little bit more on what are the kind of unmet needs at this point? Where is the biggest opportunity to continue to kind of roll out the product? And just ultimately, how much larger can this franchise become over time? Thank you.
>
> Davis: . . . Increasingly, the opportunity to go to a broader age cohorts as we think about going now to people age 45, that ability to move into the mid-adult segment is a real opportunity in the United States. It continues to be a driver of growth. It's increasingly going to be a growth driver in Europe, ***and it is currently an important part of why we're driving growth with the recent expansion we got in China***, and there are more markets to come.
>
> ***So, as we look at that, that's going to be another lever of growth.*** Obviously, the difference here is this requires consumer activation. That takes commercial investment and a lot of heavy lifting. We've demonstrated we can do it like we've started to do in China and as we're starting to do in the United States. . . .

34

111.     As a result of Defendants' misrepresentations and omissions on October 26, 2023, Merck's stock price was artificially inflated and/or artificially maintained. Indeed, Defendants' statements drove the price of Merck's shares up by $1.92 per share, approximately 2% percent, to close on October 26, 2023, at $105.55 per share.

112.     Securities analysts reacted favorably to Defendants' statements and Merck's Q3 2023 financial results. For example:

(a)     On October 26, 2023, Jefferies published a report, stating that "Gardasil has large growth opportunity in China + stable growth levels in US;" and

(b)     On October 26, 2023, Wolfe Research reacted similarly, stating that "MRK remains very confident that it will continue to grow and achieve >$11B in sales by 2030; have made big mfg improvements, ramping now at two sites."

113.     Defendants' Gardasil Growth Statements at ¶110 were materially false and misleading when made because:

(a)     During the summer of 2022, Merck learned from a consultant that Chinese consumers were changing their spending behaviors and beginning to prefer local products over multinational products like Gardasil. ¶¶78-82. Indeed, Chinese consumers were becoming more cost conscious and no longer viewed multinational brands as superior to local alternatives. *Id*.

(b)     Defendants knew that Chinese brands were developing domestic low-cost HPV vaccines and the Company discussed the effects of this growing local competition on Gardasil sales in China. ¶81.

(c)     By the start of the Class Period, China's August 2022 female age eligibility expansion for Gardasil had run its course, meaning, even for the added ages, Merck had vaccinated

35

the majority of the females who could afford and wanted to take the Gardasil vaccine. Thus, Merck could not drive further growth in China among females ages 9-45 years old. ¶¶ 46, 77-98, 103.

(d)    Merck's ability to expand into China's lower-tier cities was being adversely impacted by low-cost competitors in those lower-tiered cities.  ¶¶54, 57-60.

(e)    The slowdown in the Chinese economy was also adversely impacting Gardasil sales in China. ¶¶56, 82, 221, 223.

(f)    Merck's inventory of Gardasil had been piling up from a slowdown in sell-through at the China CDCs and POVs. As a result, Merck was forced to take the unusual step, by October or November 2023, of diverting Gardasil doses labeled and intended for China to other countries as the Chinese market was overstocked. ¶¶84, 87-91. Even with these efforts, the amount of unsold inventory was so alarming that shortly after this misrepresentation (late 2023), the Company learned that China did not use as much Gardasil 9 as initially projected and observed negative trends in China — demand for Gardasil 9 in China was declining and inventory there was increasing. ¶¶92-98. Thus, the Company was discussing ramping down its plan for Gardasil 9 production in 2024,[6] undermining any notion that China was or would drive growth. *Id.*

(g)    The stockpile of excess unwanted inventory of Gardasil was so high and demand so saturated that it would ultimately result in a massive impairment charge by Zhifei in 2025 for Gardasil that was too close to its expiration date for the China CDCs to sell. ¶¶83-86, 240.[7]

---

[6] By 2024, Gardasil 9 made up the vast majority of Merck's Gardasil business in China. According to data released by Zhifei, Gardasil 9 accounted for 84% of the total Gardasil that the Company sought to sell during the second half of 2023.

[7] As set forth above, Gardasil has a three-year shelf life, but the China CDCs will not accept product for sale that is within one year of its expiration date. Gardasil shipped by Merck to Zhifei in 2023 and early 2024 was nearing its "too late to sell" date for the China CDCs by late 2025.

36

### 2.   Q3 2023 10-Q (November 3, 2023)

114.   On November 3, 2023, Merck filed its quarterly report on Form 10-Q for Q3 2023 ("Q3 2023 10-Q") with the SEC, accompanied by SOX Certifications signed by Defendants Davis and Litchfield.  The Q3 2023 10-Q stated, in pertinent part:

Combined worldwide sales of *Gardasil* (Human Papillomavirus Quadrivalent [Types 6, 11, 16 and 18] Vaccine, Recombinant) and *Gardasil 9*, vaccines to help prevent certain cancers and other diseases caused by certain types of human papillomavirus (HPV), grew 13% and 29% in the third quarter and first nine months of 2023, respectively, ***driven primarily by strong demand outside of the U.S., particularly in China due in part to continued uptake of the expanded indication of Gardasil 9 for girls and women 9 to 45 years of age***.

115.   Defendants' Gardasil Growth Statements at ¶114 were materially false and misleading when made for the reasons set forth in ¶113.

### 3.   UBS BioPharma Conference (November 8, 2023)

116.   On November 8, 2023, Defendant Oosthuizen presented at the UBS BioPharma Conference. During the conference, a securities analyst from UBS asked about which countries Merck expected to drive Gardasil's sales growth, and Oosthuizen confirmed there remained opportunity for growth in Gardasil sales in China:

Trung Huynh: And you noted, I think earlier this year right at the start, you want to double GARDASIL sales in the future. And geographically, where is that going to come from? I think from our sort of analysis, we think that China is probably 70% of the ex-US market, I guess, is that right? And then where else, what's the geographies that you can grow?

Oosthuizen: Yeah. So we spoke that we will get to $11 billion-plus of sales for . . . and ***we will continue to see growth in China. I mean, China has done exceptionally well, but there's still opportunity in China. . . .***

117.   After the conference, UBS reacted favorably to Defendants' statements. On November 8, 2023, UBS published a report titled "Takeaways from the UBS BioPharma Conference," in which UBS analysts wrote that "Gardasil remains a huge opportunity" and further

stressed that "significant progress has been made to help drive growth in China due to huge demand."

118. Defendants' Gardasil Growth Statements at ¶116 were materially false and misleading when made for the reasons set forth in ¶113.

### 4. Jefferies London Healthcare Conference (November 16, 2023)

119. On November 16, 2023, Defendant Litchfield participated in the Jefferies London Healthcare Conference. During the conference, Jefferies analyst Akash Tewari asked how the market should think about Merck's "confidence that GARDASIL can grow" in China and "about the cadence for GARDASIL 2025 and beyond[,]" considering Chinese competitors entering the HPV vaccine market. Litchfield emphasized that Merck saw an "inflection in our revenue" from the 9 to 45 age expansion in China at the end of 2022 and expected Gardasil 9 to continue to drive "*growth in the female segment*" and that "*there's more growth that will come from it:*"

> Now, in China. China, we saw an inflection in our revenue really at the end of 2022 when we had approval for GARDASIL 9 for the full age cohort of 9 through 45. Prior to that, GARDASIL was approved for the age group 16 to 26 as GARDASIL 9 and GARDASIL 4 was approved for 9 through 15 and 27 through 45. And as you rightly note, we have competition in China, a bivalent competitor. What we've seen is China really recognizes the innovation that we're bringing. The 9-valent is very different to the 2-valent and the 4-valent, *and that's driving growth in the female segment. We're penetrating that segment, but there's more growth that will come from it.*

120. Defendants' Gardasil Growth Statements at ¶119 were materially false and misleading when made for the reasons set forth in ¶113.

### 5. Goldman Sachs Healthcare C-Suite Unscripted Conference (January 4, 2024)

121. On January 4, 2024, Defendant Davis participated in the Goldman Sachs Healthcare C-Suite Unscripted Conference. During the conference, the Goldman Sachs analyst mentioned that the market for Gardasil in China has "been more dynamic and a little bit uncertain[,]" referenced

domestic competition, and simply asked: "Confidence in the China as a source of growth[?]" Davis replied:

> ***Continue to see it as an opportunity for growth.*** The next wave of opportunity there is going to be gender neutral. . . . So, obviously, ***we've seen great success on the female cohort***. As we start to address it with the male cohort, we have to get the approval. So, obviously, that process is underway. But once we're able to achieve that, that is still a meaningful opportunity in that market.

122. As a result of Defendants' misrepresentations and omissions on January 4, 2024, Merck's stock price was artificially inflated and/or artificially maintained. Indeed, Defendants' statements drove the price of Merck's shares up by $2.24 per share, approximately 2% percent, to close on January 4, 2024, at $117.01 per share.

123. Defendants' Gardasil Growth Statements at ¶121 were materially false and misleading when made for the reasons set forth in ¶113.

### 6.    J.P. Morgan Healthcare Conference (January 8, 2024)

124. On January 8, 2024, after the market closed, Defendant Davis presented at the J.P. Morgan Healthcare Conference.  During the presentation, Davis stated the following, in relevant part:

> [W]e expect to continue to do quite well into 2024, driven on movement, a continued movement into earlier stages of disease and into broader tumor types, ***with our vaccines business based on GARDASIL as the foundation. . . . GARDASIL is continuing to do quite well and will continue to be a growth driver***.

125. As a result of Defendants' misrepresentations and omissions on January 8, 2024, Merck's stock price was artificially inflated and/or artificially maintained. Indeed, Defendants' statements drove the price of Merck's shares up by $1.05 per share, approximately 0.9% percent, to close on January 9, 2024, at $118.43 per share.

126. Defendants' Gardasil Growth Statements at ¶124 were materially false and misleading when made for the reasons set forth in ¶113.

**7.      Q4 2023 Financial Results Press Release (February 1, 2024)**

127.    On February 1, 2024, before the market opened, Merck issued a press release announcing its Q4 and full year 2023 results. The press release, filed on Form 8-K with the SEC, stated that Gardasil had netted $1.87 billion in revenue for the quarter and had "***[g]rowth due to strong global demand, particularly in China***[.]"

128.    Defendants' Gardasil Growth Statements at ¶127 were materially false and misleading when made for the reasons set forth in ¶113. Additionally, Defendants failed to disclose the following adverse facts, which were known to or recklessly disregarded by Defendants:

(a)      In January 2024, Merck substantially reduced the amount of alum that it would manufacture for the entirety of 2024 due to a "significant" decline in demand for Gardasil 9 in China. ¶¶99-102.

(b)      As of January 2024, Merck observed that Zhifei's Gardasil sales to China CDCs rapidly declined on a month-over-month basis. ¶104.

**8.      Q4 2023 Earnings Call (February 1, 2024)**

129.    That same day, on February 1, 2024, Merck also hosted its Q4 2023 Earnings Call, in which Defendants Davis and Litchfield, among others, participated.

130.    During the question-and-answer portion of the Q4 2023 Earnings Call, Defendants Davis and Litchfield discussed Gardasil's new two dose regimen for girls aged 9-14 (down from three doses for other female cohorts)[8] and Merck's growth and revenue opportunities in China in the face of HPV vaccine competitors. Davis stated, in relevant part:

> So, there's actually been Chinese competitors with an offering for some time actually in the Chinese market, and that market is large. We continue to believe in the eligible cohorts in just the urban females, which is the Tier 1 to Tier 3 cities, is about 200 million – a little over 200 million women. And so, of that, we think

---

[8] In January 2024, NMPA approved a two-dose schedule for girls aged 9-14 in China. Women 15 and older still have the three-dose schedule.

probably about 30% have actually received vaccination.  So, you're still looking at 120 million, 130 million eligible population.

As we look at this and as we've seen over time, we continue to be very competitive. We're maintaining a vast majority of share in the private market, and really you're seeing most of the local competitors *go to the lower tier cities* and to *a different population than we've been targeting. So, that does not change our view of the growth potential in China.* Long-term, obviously, we will continue to face competition there, and we are positioning ourselves to continue to succeed there. But the approval you're talking about is not changing our view.

131.     Defendant Litchfield followed Defendant Davis's statements by reiterating, in relevant part, that Merck has "*significant opportunity to protect further females in China*."

132.     As a result of Defendants' misrepresentations and omissions on February 1, 2024, Merck's stock price was artificially inflated and/or artificially maintained. Indeed, Defendants' statements drove the price of Merck's shares up by $5.60 per share, approximately 4.6% percent, to close on February 1, 2024, at $126.38 per share.

133.     Securities analysts reacted favorably to Defendants' statements and Merck's Q4 2023 financial results. For example, on February 1, 2024, Jefferies published a report after the Q4 2023 Earnings Call, wherein Jefferies analysts reiterated their bullish position on Gardasil in China: "Gardasil has large growth opportunity in China + stable growth levels in US."

134.     Defendants' Gardasil Growth Statements at ¶¶130-131 were materially false and misleading when made for the reasons set forth in ¶¶113, 128.

### 9.     2023 10-K (February 26, 2024)

135.     On February 26, 2024, Merck filed with the SEC its annual report on Form 10-K for Q4 2023 and FY 2023 ("2023 10-K"), signed by, and accompanied by SOX Certifications signed by, Defendants Davis and Litchfield. The 2023 10-K stated that "[c]ombined worldwide sales of *Gardasil* and *Gardasil* 9 . . . grew 29% in 2023 *driven by strong demand outside of the*

41

*U.S., particularly in China due in part to continued uptake of the expanded indication of Gardasil 9 for girls and women 9 to 45 years of age*."

136.    Defendants' Gardasil Growth Statements at ¶135 were materially false and misleading when made for the reasons set forth in ¶¶113, 128.

### 10.    Q1 2024 Financial Release Press Release (April 25, 2024)

137.    On April 25, 2024, before the market opened, Merck issued a press release announcing its Q1 2024 results. The press release, filed on the Company's Form 8-K with the SEC, stated that Gardasil had netted $2.25 billion in revenue and had "*[g]rowth due to strong demand, particularly in China*[.]"

138.    Defendants' Gardasil Growth Statements at ¶137 were materially false and misleading when made for the reasons set forth in ¶¶113,128. Additionally, Defendants failed to disclose the following adverse facts, which were known to or recklessly disregarded by Defendants: by the end of Q1 2024, Merck observed that Zhifei's Gardasil sales to China CDCs had rapidly declined over the course of the quarter and that Zhifei's Gardasil inventory levels had correspondingly steeply risen. ¶104.

### 11.    Q1 2024 10-Q (May 3, 2024)

139.    On May 3, 2024, Merck filed its quarterly report on Form 10-Q for Q1 2024 (the "Q1 2024 10-Q") with the SEC, accompanied by SOX Certifications signed by Defendants Davis and Litchfield. The Q1 2024 10-Q stated, in pertinent part:

> Combined worldwide sales of Gardasil and Gardasil 9, vaccines to help prevent certain cancers and other diseases caused by certain types of human papillomavirus (HPV), grew 14% in the first quarter of 2024 *primarily due to strong demand, particularly in China,* which also benefited from the timing of shipments, as well as public sector buying patterns in the U.S., and higher pricing.

140.    Defendants' Gardasil Growth Statements at ¶139 were materially false and misleading when made for the reasons set forth in ¶¶113, 128, 138.

42

### 12.   Bank of America Healthcare Conference (May 15, 2024)

141.   On May 15, 2024, Defendant Litchfield attended the Bank of America Healthcare Conference. In response to a question about Merck's competition in China, Litchfield stated the following, in relevant part:

> *So, we feel very confidently about our GARDASIL business and its outlook going forward. . . .*
>
> *. . . .*
>
> *So, we're confident in our opportunities for growth and that growth is global*. . . .
>
> *As it pertains to China*, China is a large market, and today, we are approved in girls and are addressing people who have the affordability to pay for the vaccine out of their pocket. That's a group of around 200 million people. Today, somewhere between 30% and 40% of that group have received an HPV vaccine. *So the opportunity to provide further protection is still huge.*
>
> We've been competing against a local bivalent vaccine. We're aware of competition, looking at a 9-valent. *We're confident in our ability to compete*, at the same time moving into the male segment, subject to regulatory approval, and we sought our filing there at the end of 2022. So we're confident in our business globally, *and we remain confident in the opportunity to protect lives in China.*

142.   Defendants' Gardasil Growth Statements at ¶141 were materially false and misleading when made for the reasons set forth in ¶¶113, 128, 138.

### 13.   Q2 2024 Earnings Call (July 30, 2024)

143.   During the Q2 2024 Earnings Call on July 30, 2024, Defendants continued to make false and misleading statements and omissions during the call by masking the true extent that female demand in China for Gardasil was deteriorating. For example, while maintaining Merck's target of $11 billion in Gardasil sales by 2030, Defendant Litchfield said:

> *We believe the opportunity in China remains very attractive* as there are more than 120 million females in the addressable population living in Tier 1 to Tier 5 cities who have not yet received the protection of an HPV vaccine. As we said before, it will take increasing efforts to educate and activate the next wave of patients.

43

144.    Defendant Davis also boasted about the "*market expansion opportunity in China*" among unvaccinated females in the approved age cohort in China:

When we quote the 200 million total females of which we would say we're 30% to 40% penetrated today, that's really in the Tier 1 to 5 cities that we think can afford a cash pay market. The total population accessible in China is much bigger. And so I don't think we should assume we're all competing for that small slice. There's a much bigger slice. We have chosen not to go for that bigger piece because, obviously, we can't get into the local vaccination program because we don't produce GARDASIL in China. Our competitors will be able to do that. So I think I would just caution all to not view it as a zero-sum game. *I think there's still market expansion opportunity in China that will benefit both us and the competitors*. And, frankly, the other thing we have to see is how quickly will the male indication be given to others beyond us. We believe there's a chance we could be sitting alone with that as well.

145.    Defendants' Gardasil Growth Statements at ¶¶143-144 were materially false and misleading when made for the reasons set forth in ¶¶113, 128, 138. Additionally, Defendants failed to disclose the following adverse facts, which were known to or recklessly disregarded by Defendants: during each of the first two quarters of 2024, Merck observed that Zhifei's Gardasil sales to China CDCs had progressively declined and that its Gardasil inventory levels had progressively risen. ¶¶106.

**14.    Q3 2024 Earnings Call (October 31, 2024)**

146.    During Merck's Q3 2024 earnings call on October 31, 2024 ("Q3 2024 Earnings Call"), Defendant Davis represented that, "*in China, [] there is an attractive long-term opportunity, given the significant number of females yet to be immunized and the potential approval for males next year*."

147.    Defendants' Gardasil Growth Statements at ¶146 were materially false and misleading when made for the reasons set forth in ¶¶113, 128, 138, 145. Additionally, Defendants failed to disclose the following adverse facts, which were known to or recklessly disregarded by Defendants:

(a)    During each of the first three quarters of 2024, Merck observed that Zhifei's Gardasil sales to China CDCs had progressively declined and that its Gardasil inventory levels had progressively rise. ¶106.

(b)    As later revealed in Merck's 2024 Form 10-K, Defendants observed "[l]ower demand in China persisted and, at the end of 2024, overall channel inventory levels in China remained elevated at above normal levels." Inventory levels were so high at the end of 2024 that it ultimately caused Merck to "temporarily pause shipments to China beginning in February 2025 through at least the middle of the year . . . ." ¶¶105, 230.

**B.    Defendants' Materially False and Misleading Risk Disclosure Statements**

**1.    Q3 2023 10-Q (November 3, 2023)**

148.    Merck's Q3 2023 10-Q incorporated by reference the risk disclosures reported in Merck's annual report filed on Form 10-K with the SEC on February 24, 2023 ("2022 10-K"), which in turn stated, in pertinent part:

> Key products generate a significant amount of the Company's profits and cash flows, and any events that adversely affect the markets for its leading products could have a material adverse effect on the Company's results of operations and financial condition. The Company expects that sales of *Lagevrio*, which were $5.7 billion in 2022, will decline significantly to approximately $1.0 billion in 2023.
>
> ***The Company's ability to generate profits and operating cash flow depends largely upon the continued profitability of the Company's key products***, such as *Keytruda*, ***Gardasil/Gardasil 9***, Lynparza, *Bravecto*, and *Bridion*. . . . As a result of the Company's dependence on key products, ***any event that adversely affects any of these products or the markets for any of these products could have a significant adverse impact on results of operations and financial condition***. These events could include loss of patent protection, increased costs associated with manufacturing, generic or over-the-counter availability of the Company's product or a competitive product, the discovery of previously unknown side effects, results of post-approval trials, increased competition from the introduction of new, more effective treatments and discontinuation or removal from the market of the product for any reason. Such events could have a material adverse effect on the sales of any such products.
>
> . . . .

The Company may not be able to realize the expected benefits of its investments in emerging markets.

***The Company has been taking steps to increase its sales in emerging markets. However, there is no guarantee that the Company's efforts to expand sales in these markets will succeed***. Some countries within emerging markets may be especially vulnerable to periods of global financial instability or may have very limited resources to spend on health care. . . . ***The Company may also be required to increase its reliance on third-party agents within less developed markets, which may affect its ability to realize continued growth and may also increase the Company's risk exposure. . . .***

***The Company's business in China has grown rapidly in the past few years, and the importance of China to the Company's overall pharmaceutical and vaccines business outside the U.S. has increased accordingly. . . .***

[C]ontinued growth of the Company's business in China is dependent upon ongoing development of a favorable environment for innovative pharmaceutical products and vaccines, sustained access for the Company's currently marketed products, and the absence of trade impediments or adverse pricing controls. . . .

[S]ales within emerging markets carry significant risks. However, at the same time, macro economic growth of selected emerging markets is expected to outpace Europe and even the U.S., leading to significant increased health care spending in those countries and access to innovative medicines for patients. ***A failure to maintain the Company's presence in emerging markets could therefore have a material adverse effect on the Company's business, cash flow, results of operations, financial condition and prospects.***

149.    The Q3 2023 10-Q also affirmatively stated that ***"[t]here have been no material changes in market risk exposures that affect the disclosures***" presented in Merck's 2022 10-K.

150.    Defendants' Risk Disclosure Statements at ¶¶148-149 were materially false and misleading when made because they failed to inform investors of the true facts that adverse events that the Company referred to as remote possibilities had, in fact, already materialized as to Gardasil's prospects in China, the largest market for one of the Company's top selling products. Therefore, the Company expected Gardasil sales to significantly decline, which would materially impact Merck's bottom line.

46

151.   Specifically, Defendants knew or recklessly disregarded the following adverse materials which they failed to disclose:

(a)   During the summer of 2022, Merck learned from a consultant that Chinese consumers were changing their spending behaviors and beginning to prefer local products over multinational products like Gardasil. ¶¶78-82. Indeed, Chinese consumers were becoming more cost conscious and no longer viewed multinational brands as superior to local alternatives. *Id*.

(b)   Defendants knew that Chinese brands were developing domestic low-cost HPV vaccines and the Company discussed the effects of this growing local competition on Gardasil sales in China. ¶81.

(c)   By the start of the Class Period, China's August 2022 female age eligibility expansion for Gardasil had run its course, meaning, even for the added ages, Merck had vaccinated the majority of the females who could afford and wanted to take the Gardasil vaccine. Thus, Merck could not drive further growth in China among females ages 9-45 years old. ¶¶ 46, 77-98, 103.

(d)   Merck's ability to expand into China's lower-tier cities was being adversely impacted by low-cost competitors in those lower-tiered cities. ¶¶54, 57-60.

(e)   The slowdown in the Chinese economy was also adversely impacting Gardasil sales in China. ¶¶56, 82, 221, 223.

(f)   Merck's inventory of Gardasil had been piling up from a slowdown in sell-through at the China CDCs and POVs. As a result, Merck was forced to take the unusual step, by October or November 2023, of diverting Gardasil doses labeled and intended for China to other countries as the Chinese market was overstocked. ¶¶84, 87-91. Even with these efforts, the amount of unsold inventory was so alarming that shortly after this misrepresentation (late 2023), the Company learned that China did not use as much Gardasil 9 as initially projected and observed

47

negative trends in China — demand for Gardasil 9 in China was declining and inventory there was increasing. ¶¶92-98. Thus, the Company was discussing ramping down its plan for Gardasil 9 production in 2024,[9] undermining any notion that China was or would drive growth. *Id.* The stockpile of excess unwanted inventory of Gardasil was so high and demand so saturated that it would ultimately result in a massive impairment charge by Zhifei in 2025 for Gardasil that was too close to its expiration date for the China CDCs to sell. ¶¶83-86, 240.[10]

### 2. 2023 10-K (February 26, 2024)

152. Merck's 2023 10-K contained risk disclosures, which stated, in pertinent part:

Key products generate a significant amount of the Company's profits and cash flows, and any events that adversely affect the markets for its leading products could have a material adverse effect on the Company's results of operations and financial condition.

***The Company's ability to generate profits and operating cash flow depends largely upon the continued profitability of the Company's key products***, such as *Keytruda*, ***Gardasil/Gardasil 9,*** Lynparza, *Bravecto*, and *Bridion*. In 2023, the Company's oncology portfolio, led by Keytruda, and its vaccines portfolio, ***led by Gardasil/Gardasil 9, represented substantially all of the Company's revenue growth.*** In particular, in the aggregate, in 2023, sales of Keytruda and Gardasil/Gardasil 9 represented 56% of the Company's total sales. ***As a result of the Company's dependence on key products, any event that adversely affects any of these products or the markets for any of these products could have a significant adverse impact on results of operations and financial condition.*** These events could include loss of patent protection, increased costs associated with manufacturing, generic or over-the-counter availability of the Company's product or a competitive product, the discovery of previously unknown side effects, results of post-approval trials, increased competition from the introduction of new, more effective treatments and discontinuation or removal from the market of the product for any reason. Such events could have a material adverse effect on the sales of any such products.

---

[9] By 2024, Gardasil 9 made up the vast majority of Merck's Gardasil business in China. According to data released by Zhifei, Gardasil 9 accounted for 84% of the total Gardasil that the Company sought to sell during the second half of 2023.

[10] As set forth above, Gardasil has a three-year shelf life, but the China CDCs will not accept product for sale that is within one year of its expiration date. Gardasil shipped by Merck to Zhifei in 2023 and early 2024 was nearing its "too late to sell" date for the China CDCs by late 2025.

. . . .

The Company may not be able to realize the expected benefits of its investments in emerging markets.

*The Company has been taking steps to increase its sales in emerging markets. However, there is no guarantee that the Company's efforts to expand sales in these markets will succeed*. Some countries within emerging markets may be especially vulnerable to periods of global financial instability or may have very limited resources to spend on health care. . . . *The Company may also be required to increase its reliance on third-party agents within less developed markets, which may affect its ability to realize continued growth and may also increase the Company's risk exposure. . . .*

*The Company's business in China has grown rapidly in the past few years, and the importance of China to the Company's overall pharmaceutical and vaccines business outside the U.S. has increased accordingly*. . . .

[C]ontinued growth of the Company's business in China is dependent upon ongoing development of a favorable environment for innovative pharmaceutical products and vaccines, sustained access for the Company's currently marketed products, and the absence of trade impediments or adverse pricing controls. . . .

[S]ales within emerging markets carry significant risks. However, at the same time, macro-economic growth of selected emerging markets is expected to lead to significant increased health care spending in those countries and access to innovative medicines for patients. *A failure to maintain the Company's presence in emerging markets could therefore have a material adverse effect on the Company's business, cash flow, results of operations, financial condition and prospects.*

153.    Defendants' Gardasil Risk Disclosure Statements at ¶152 were materially false and misleading when made for the reasons set forth in ¶¶150-151. Additionally, Defendants failed to disclose the following adverse facts, which were known to or recklessly disregarded by Defendants:

(a)    In January 2024, Merck substantially reduced the amount of alum that it would manufacture for the entirety of 2024 due to a "significant" decline in demand for Gardasil 9 in China. ¶¶99-102.

49

(b)     As of January 2024, Merck observed that Zhifei's Gardasil sales to China CDCs rapidly declined on a month-over-month basis. ¶104.

### 3.     Q1 2024 10-Q (May 3, 2024)

154.     The Q1 2024 10-Q also referenced and incorporated the same "Risk Factors" as reported in the Company's 2023 10-K, at ¶152.

155.     The Q1 2024 10-Q also affirmatively stated that "*[t]here have been no material changes in market risk exposures that affect the disclosures presented*" in Merck's 2023 10-K.

156.     Defendants' Gardasil Risk Disclosure Statements at ¶¶154-155 were materially false and misleading when made for the reasons set forth in ¶¶150, 151, 153. Additionally, Defendants failed to disclose the following adverse facts, which were known to or recklessly disregarded by Defendants: by the end of Q1 2024, Merck observed that Zhifei's Gardasil sales to China CDCs had rapidly declined over the course of the quarter and that its Gardasil inventory levels had correspondingly steeply risen. ¶104.

### C.     Defendants' Materially False and Misleading Gardasil Supply Constraint Statements

157.     Prior to the start of the Class Period, when Gardasil sales were robust, Merck could not produce Gardasil fast enough to keep up with sales in China. China constituted the world's largest market for Gardasil, comprising approximately 50% of Merck's worldwide Gardasil sales and 70% of Merck's international Gardasil sales. ¶51. But, as set forth herein, by the start of the Class Period, the Gardasil market in China was approaching saturation, and supply constraints was no longer the primary factor limiting sales. ¶¶77-98, 103.

158.     Nonetheless, during the Class Period, Defendants continued to represent that supply constraints — not declining demand in China — was the primary factor limiting Gardasil sales growth.

### 1.    UBS BioPharma Conference (November 8, 2023)

159.    On November 8, 2023, Defendant Oosthuizen presented at the UBS BioPharma Conference. During the conference, a securities analyst at UBS asked about the supply of Gardasil given the demand:

> Trung Huynh: Okay, excellent. Okay, if we can move past KEYTRUDA, I mean, the second big growth driver, GARDASIL, continues to surprise investors. The sheer growth there is incredible.  For 2024, where are you with supply given the fact that there is increasingly a lot of demand for this product there?

> Oosthuizen: Yeah, that's right. Yeah, GARDASIL has done exceptionally well, and there's still a huge opportunity. If you just look at global vaccination rates and the evidence we have with GARDASIL is a meaningful vaccine in terms of preventing HPV-related cancers. ***We are still not completely unconstrained from a supply perspective, but we have made significant progress and that's really what's been helpful in driving the growth in China, in particular, where there's huge underlying demand, and we've been increasingly able to supply for that demand.***

> ***But as we head into 2024, we will still be constrained.*** We should be unconstrained by 2025.  So that's the timeline that we want to be in a position where we can really supply in an unconstrained way across the world.

160.    Defendants' Gardasil Supply Constraint Statements at ¶159 were materially false and misleading when made because Merck's ability to meet demand for Gardasil, particularly in China, was not constrained by its capacity to manufacture Gardasil and there was not a "huge underlying demand" in China. Defendants knew or recklessly disregarded the following adverse materials which they failed to disclose:

(a)    Sell-through at China CDCs and POVs started to slow down indicating Gardasil was reaching saturation in the Tier 1 and Tier 2 cities Merck was targeting. ¶¶77-98, 103.

(b)    Merck's inventory of Gardasil had been piling up from a lack of demand in China for a significant period.   As a result, Merck was forced to take the unusual step by October or November 2023, to offload millions of Gardasil doses labeled and intended for China to other countries as China was overstocked. ¶¶84, 87-91. Even with these efforts, the amount of unsold

51

inventory was so alarming that shortly after this misrepresentation (Q4 2023), the Company discussed lowering 2024 Gardasil 9 production, not ramping up as originally planned, due to negative trends in China. ¶¶92-98.

(c)    When Defendants ultimately revealed Gardasil's poor performance in China, Defendants admitted that Merck's supply capacity was not a contributing factor to Gardasil's decline. ¶¶200-228.

(d)    Merck oversupplied its Chinese distributor with so much Gardasil that the distributor has taken more than two years to work through its Gardasil inventory which is now unused and expiring. ¶¶83-86, 240.

**2.    Goldman Sachs Healthcare C-Suite Conference (January 4, 2024)**

161.    On January 4, 2024, Defendant Davis, together with Peter Dannenbaum, Vice President, Investor Relations, participated in the Goldman Sachs Healthcare C-Suite Unscripted Conference. In response to a question posed by Goldman Sachs analyst Chris Shibutani about Gardasil's growth trajectory, Davis focused on Merck's supply channels for Gardasil and focused on the high unmet need for Gardasil: "***You'll see supply from those facilities ramp over the next several years. So, we continue to believe we'll be in a position where we will be unconstrained in our ability to meet demand***. ***We're not there yet, but we're on a path to get there***."

162.    Defendants' Gardasil Supply Constraint Statements at ¶161 were materially false and misleading when made for the reasons set forth in ¶160.

**3.    TD Cowen Healthcare Conference (March 5, 2024)**

163.    On March 5, 2024, Defendant Romanelli, together with Peter Dannenbaum, Merck's Vice President, Investor Relations, participated in the TD Cowen Healthcare Conference. During the conference, TD Cowen analyst Steve Scala interviewed Romanelli and Dannenbaum. Scala began by stating that TD Cowen's models show that Merck's international sales of Gardasil

— independent of U.S. sales — would still "achieve roughly $11 billion in 2030." Accordingly, Scala inquired: "So tell me why $11 billion is the cap and why it can't be a whole lot larger and maybe that much just in your territory?" In relevant part, Romanelli responded by emphasizing that Merck's manufacturing team has "***increased capacity over the past couple of years to a point where next year we should not be constrained by manufacturing capacity***."

164.    Defendants' Gardasil Supply Constraint Statements at ¶163 were materially false and misleading when made for the reasons set forth in ¶160. Additionally, Defendants failed to disclose the following adverse facts, which were known to or recklessly disregarded by Defendants: in January 2024, Merck substantially reduced the amount of alum that it would manufacture for the entirety of 2024 due to a "significant" decline in demand for Gardasil 9 in China ¶¶99-102.

### 4.    Q1 2024 Earnings Call (April 25, 2024)

165.    On April 25, 2024, Merck hosted its earnings call for its first quarter 2024 financial results (the "Q1 2024 Earnings Call"), in which Defendants Davis and Litchfield, among others, participated. During the question-and-answer portion of the Q1 2024 Earnings Call, Defendant Litchfield reiterated Merck's ability to continue to drive Gardasil growth through 2024 and 2025 upon reaching unconstrained manufacturing capacity:

> As we look at overall growth for GARDASIL, given where we are with the level of vaccinations across the world, given the manufacturing that we have been scaling up, ***we're confident in our ability to continue to drive growth during 2024, and in 2025, we will see our manufacturing capacity unconstrained, so enabling us to further supply and support the market.***
>
> As we've talked in the past, our opportunities for growth are significant as we look to continue to improve on adolescent vaccination rates, as we look to improve upon gender neutral vaccinations, as we look to really activate the mid-adult segment, but increasingly get to the lower income and middle income markets, which will come at a different price point. ***As we sit here today, continue to be confident in the outlook for GARDASIL over both the near and the long term***.

53

166.   As a result of Defendants' misrepresentations and omissions on April 25, 2024, Merck's stock price was artificially inflated and/or artificially maintained.  Indeed, Defendants' statements drove the price of Merck's shares up by $3.72 per share, approximately 3% percent, to close on April 25, 2024, at $130.72 per share.

167.   Securities analysts reacted favorably to Defendants' statements and Merck's Q1 2024 financial results. On April 25, 2024,  Jefferies published a report after the Q1 2024 Earnings Call titled "MRK: the execution continues to build," and stated: "Overall, MRK cont[inues] to remain confident here re: growth of Gardasil and noted that manufacturing has been scaling up (2025 should see manuf[acturing] capacity) & remain confident in ability to cont[inue] to drive growth during 2024." The Jefferies analysts further emphasized that Gardasil had tremendous upside in China in 2024: "As a reminder, we've expected strong growth in Gardasil sales ex-US, specifically in China[.]"

168.   Defendants' Gardasil Supply Constraint Statements at ¶165 were materially false and misleading when made for the reasons set forth in ¶¶160, 164.

**D.    Defendants' Materially False and Misleading Gardasil Stepdown Statements**

**1.    Q2 2024 Earnings Call (July 30, 2024)**

169.   During the Q2 2024 Earnings Call on July 30, 2024, Defendant Davis also represented that the step-down in sell-through at China CDCs in Q2 2024 was "***surprising***" to Merck and "***a meaningful departure from prior trends we've seen both throughout, really, all of 2023 and into the first quarter of 2024***[,]" and further noted that "***we don't believe this stepdown, therefore, represents any change in the competitive dynamic***:"

> ***What's unclear to us, and what we're trying to understand, is that during the second quarter, we saw a significant stepdown in shipments from Zhifei to the points of vaccination. The reductions during the second quarter was surprising and, I would point out, was a meaningful departure from prior trends we've seen both throughout, really, all of 2023 and into the first quarter of 2024. So, as we***

*look at this, we're wanting to understand what would cause the trend break we saw.  And I can tell you what we know as of now is we believe there could be multiple factors that may be contributing to this dynamic, and we're working closely with our partner to try to tease out what exactly is happening.*

*. . . [I]mportantly, we see the market share for GARDASIL as stable or actually increasing right now in the marketplace. We don't believe this stepdown, therefore, represents any change in the competitive dynamic . . . .*

170.   During the Q2 2024 Earnings Call, in response to a question from an Evercore ISI analyst about what Merck was seeing in the marketplace for Gardasil in China, Defendant Davis added: "***Nothing has changed in that dynamic in what we're seeing right now. So as we look forward, our belief in China being a significant contributor is unchanged***."

171.   Defendants' Gardasil Stepdown Statements at ¶¶169-170 were materially false and misleading when made, as Defendants misrepresented the true degree and timing of Gardasil's problems in China. Specifically, Defendants failed to disclose the following adverse facts, which were known or recklessly disregarded by Defendants:

(a)   By the start of the Class Period, Defendants had observed red flags that China's top-tier cities were nearly saturated and that the Company's efforts to generate interest in Gardasil in China's lower-tier cities were futile. ¶¶54, 57-60, 77-98, 103.

(b)   Even as Defendants sought to expand Gardasil's reach to the addressable female market in China's lower-tier cities, Defendants "always" knew that Merck would ultimately hit a saturation point for the female market for Gardasil in China. This reality was repeatedly conceded by Defendants throughout the Class Period beginning on July 30, 2024. ¶280.

(c)   Merck's inventory of Gardasil had been piling up from a lack of demand in China for a significant period. As a result, Merck was forced to take the unusual step, by October or November 2023, of diverting Gardasil doses labeled and intended for China to other countries as the Chinese market was overstocked. ¶¶84, 87-91.

(d)    In January 2024, Merck substantially reduced the amount of alum that it would manufacture for the entirety of 2024 due to a "significant" decline in demand for Gardasil in China. ¶¶99-102.

(e)    In Q1 2024, not Q2 2024, Defendants observed Zhifei's Gardasil sales and inventory significantly diminish and swell, respectively. ¶¶104.

(f)    Due to Zhifei's Gardasil inventory ballooning over two consecutive quarters and counting, it would take an extended period of time for Zhifei to work through their existing overstocked inventory. ¶¶104, 106.

172.    In connection with Merck's partial disclosure on July 30, 2024, of inventory buildup at Zhifei ¶¶200-209, the price of Merck's common stock declined from a closing market price of $127.78 per share on July 29, 2024, to a closing market price of $115.25 per share on July 30, 2024 — a decline of nearly 10%. Were it not for Defendants' materially false and misleading statements on July 30, 2024, at ¶¶169-170, Merck's stock price would have fallen even further.

### 2.    Q2 2024 10-Q (August 5, 2024)

173.    On August 5, 2024, Merck filed with the SEC its quarterly report on Form 10-Q for Q2 2024 (the "Q2 2024 10-Q"), accompanied by SOX Certifications signed by Defendants Davis and Litchfield. The Q2 2024 10-Q stated, in pertinent part:

> Combined worldwide sales of *Gardasil* and *Gardasil* 9, vaccines to help prevent certain cancers and other diseases caused by certain types of human papillomavirus (HPV), grew 1% in the second quarter of 2024 primarily driven by higher sales in the U.S. due to higher pricing, demand and public sector buying patterns, as well as higher demand in several ex-U.S. markets. Sales growth of *Gardasil/Gardasil* 9 in the second quarter of 2024 was largely offset by lower sales in China due to the timing of shipments compared with prior year. Combined worldwide sales of *Gardasil* and *Gardasil* 9 grew 7% in the first six months of 2024 primarily due to higher global demand, as well as public sector buying patterns in the U.S., and higher pricing. ***In the second quarter of 2024, the Company observed a significant decline in shipments from its distributor and commercialization partner in China, Zhifei Biological Products Co., Ltd. (Zhifei), into the points of vaccination compared with prior quarters, resulting in above normal inventory levels at***

***Zhifei.*** If shipments from Zhifei into the points of vaccination do not increase, it is likely that the Company will ship less than its full year 2024 contracted doses by the end of 2024.

174.   Defendants' Gardasil Stepdown Statements at ¶173 were materially false and misleading when made for the reasons set forth in ¶171. Specifically, this statement was false because Defendants observed this decline in shipments before the second quarter of 2024.

### 3.   Morgan Stanley Healthcare Conference (September 5, 2024)

175.   On September 5, 2024, during the trading day, Defendant Davis participated in the Morgan Stanley Healthcare Conference. During the conference, Davis spoke about the opportunities for Gardasil in China and underscored that Merck was "***seeing a normalizing of the inventory levels as it relates to Gardasil in the marketplace. . . . [Inventory levels] were never completely out of whack. But, obviously, they had risen a little bit and we're seeing them come back to normal***:"

> ***. . . As it relates to China specifically, we continue now to have confidence around where China is and where China is going to go***. I would tell you that we have a good understanding of the dynamics of what's happening in China. We are very focused on it from me, from Caroline, our CFO, all the way down to our commercial organization, and we're making progress. I think those are the important points to understand.
>
> ***. . . As it relates to the inventory levels, as it relates specifically to Gardasil, we believe you are seeing a normalizing of the inventory levels as it relates to Gardasil in the marketplace. That is a good sign. They were never completely out of whack. But, obviously, they had risen a little bit and we're seeing them come back to normal. That's important.***
>
> ***. . . That said, the opportunity is still significant. . . .***
>
> . . . .
>
> As you think about the female population, obviously, we had always expected that as you work through the bolus when we expanded to the age range up to 45, that you would see that peak and then start to decline over time and then stabilize to a base. And that is effectively what is happening. And then, the growth would then come from the male indication. ***So, the male indication will be important as a driver of growth with a solid base of females continuing. And we're confident***

*we'll be able to maintain a good share position in the face of a competitive landscape as we look forward. So, that is the basis for why we continue to believe China will be a meaningful contributor. . . .*

176. As a result of Defendants' misrepresentations and omissions on September 5, 2024, Merck's stock price was artificially inflated and/or artificially maintained. Indeed, Defendants' statements drove the price of Merck's shares up by $2.79 per share, approximately 2.4% percent, to close on September 5, 2024, at $118.59 per share.

177. Securities analysts were convinced that Merck and the Individual Defendants had a handle on the Gardasil situation in China and that it would be short-term. For instance:

(a) On September 8, 2024, J.P. Morgan published a report, which stated that "we see recent uncertainty on China Gardasil dynamics (which appear largely short-term in nature) as more than reflected in the current valuation . . . ;" and

(b) On September 9, 2024, Jefferies published a report, which reiterated prior confidence in Gardasil's China growth opportunities: "Gardasil has large growth opportunity in China + stable growth levels in US."

178. Defendants' Gardasil Stepdown Statements at ¶175 were materially false and misleading when made for the reasons set forth in ¶171. Furthermore, Defendants misleadingly gave the impression that the Gardasil situation in China was improving, emphasizing that Merck was "***seeing a normalizing of the inventory levels***," ***[inventory levels] were never completely out of whack***," and "***we're seeing them come back to normal***," when it was actually worsening — Zhifei's Gardasil sales were collapsing, Zhifei's Gardasil inventory was skyrocketing, and overall channel inventory remained unacceptably high.

179. Additionally, Defendants failed to disclose the following adverse facts, which were known to or recklessly disregarded by Defendants: during each of the first three quarters of 2024,

58

Merck observed that Zhifei's Gardasil sales to China CDCs had progressively declined and that

its Gardasil inventory levels had progressively risen.  ¶106.

### 4. Q3 2024 Earnings Call (October 31, 2024)

180.    During Merck's Q3 2024 Earnings Call on October 31, 2024, in connection with

Gardasil's performance in China, Defendant Davis stated:

> ***Overall channel inventories of GARDASIL have decreased, which is directionally encouraging*** while inventory at Zhifei remains above historical levels. We are highly focused on this market and are making progress with Zhifei to increase promotional resources and patient education efforts. ***We expect these efforts to translate to increased patient activation and demand***.  But as we've said, this will take time.

181.    During the question-and-answer portion of the Q3 2024 Earnings Call on October

31, 2024, when asked about Merck's expectations for Gardasil in China for 2025, Defendant Davis

stated, in part: "***So, I think that's just important to kind of frame where we're seeing things,*** but

understanding we're focused on this, we're bringing our efforts to drive demand, ***and we're going***

***to make progress. We are making progress,*** but it's going to take some time*.*"

182.    During the Q3 2024 Earnings Call on October 31, 2024, when asked about

Gardasil's inventory levels in China and its impact on Merck's forecast for China in 2025 ranging

from $2 billion to $3 billion, Defendant Davis stated, in part:

> "***[I]f you look at overall inventory levels in China, they did come down. And that's taking into account – and this is for GARDASIL. GARDASIL at Zhifei which, frankly, remains high and grew slightly, but that was more than offset by reductions in the CDCs and the points of vaccination. So, that's a good sign that we're seeing overall inventories coming down, which also would point to the fact that as we're looking at demand, which we're seeing stabilize, we think we're at a position now whereas we're starting to talk about what we're shipping. Our expectation is we are shipping below demand***."

183.    In connection with Merck's partial disclosure, on October 31, 2024, that Merck

would ship less than Zhifei's base purchase amounts for 2024 under the January 2023 Supply

Agreement and the Company expected Gardasil sell-through in China to continue declining in

2025, the price of Merck's common stock declined from a closing market price of $104.83 per share on October 30, 2024, to $102.32 per share on October 31, 2024, a decline of approximately 2.4%. Were it not for Defendants' materially false and misleading statements on October 31, 2024, at ¶¶180-182, Merck's stock price would have fallen even further.

184.    Defendants' Gardasil Stepdown Statements at ¶¶180-182 were materially false and misleading when made for the reasons set forth in ¶¶171, 178, 179. Furthermore, Defendants misleadingly gave the impression that the Gardasil situation in China was improving, emphasizing that Merck was "***making progress***," "***overall inventory levels in China, they did come down***[,]" "***that's a good sign that we're seeing overall inventories coming down***," Zhifei's Gardasil inventory only "grew slightly," demand was "stabiliz[ing]," and the Company was "shipping below demand[,]" when it was actually getting worse — Zhifei's Gardasil sales were collapsing, Zhifei's Gardasil inventory was skyrocketing, and overall channel inventory remained unacceptably high.

185.    Additionally, Defendants failed to disclose the following adverse facts, which were known to or recklessly disregarded by Defendants: As later revealed in Merck's 2024 Form 10-K, Defendants observed "[l]ower demand in China persisted and, at the end of 2024, overall channel inventory levels in China remained elevated at above normal levels." Inventory levels were so high at the end of 2024 that it ultimately caused Merck to "temporarily pause shipments to China beginning in February 2025 through at least the middle of the year . . . ." ¶¶105, 230.

60

### 5.    Q3 2024 10-Q (November 6, 2024)

186.    On November 6, 2024, Merck filed with the SEC its quarterly report on Form 10-Q ("Q3 2024 10-Q"), accompanied by SOX Certifications signed by Defendants Davis and Litchfield. The Q3 2024 10-Q stated, in pertinent part:

Combined worldwide sales of *Gardasil* and *Gardasil* 9, vaccines to help prevent certain cancers and other diseases caused by certain types of human papillomavirus (HPV), declined 11% in the third quarter of 2024 primarily driven by lower demand in China, partially offset by higher sales in the U.S. due to public sector buying patterns, higher pricing and demand, as well as higher demand in most international regions.  Combined worldwide sales of *Gardasil* and *Gardasil* 9 were nearly flat in the first nine months of 2024 primarily due to higher sales in the U.S. reflecting public sector buying patterns, higher pricing and demand, as well as higher demand in most international regions, offset by lower demand in China. ***In the second quarter of 2024, the Company observed a significant decline in shipments from its distributor and commercialization partner in China, Zhifei Biological Products Co., Ltd. (Zhifei), to disease and control prevention institutions and correspondingly into the points of vaccination compared with prior quarters, resulting in above normal inventory levels in China.*** This lower level of Zhifei shipments continued in the third quarter of 2024. Accordingly, the Company will ship less than its full year 2024 contracted doses to Zhifei and combined sales of *Gardasil/Gardasil* 9 in China will decline in 2024 compared with 2023, and such sales are also expected to decline in 2025 compared with 2024.

187.    Defendants' Gardasil Stepdown Statements at ¶186 were materially false and misleading when made for the reasons set forth in ¶¶171, 178, 179, 184, 185. Additionally, Defendants failed to disclose that Gardasil's situation in China was worsening. Specifically, Defendants failed to disclose the following adverse facts, which were known to or recklessly disregarded by Defendants: during Q4 2024, Defendants observed that Zhifei's Gardasil inventory levels continued to increase and sell-through remained depressed. ¶106.

### 6.    Citi Global Healthcare Conference (December 5, 2024)

188.    On December 5, 2024, during the trading day, Defendant Davis participated in the Citi Global Healthcare Conference and continued to tout Gardasil's prospects in China:

And obviously China itself, we have seen the slowdown that's happening there. We understand the fundamentals of what's happening.

61

> We are very focused on that with our partner, Zhifei, ***making good progress and bringing incremental resources to bear to drive and activate demand. We have seen demand slow, but it is stabilizing. And we believe that the opportunity there is still significant.*** And it's just going to take time for us to activate it. There's still 120 million women in the Tier 1 to 5 cities to be vaccinated. And hopefully, we'll have male indication coming soon.

189.   Securities analysts parroted Defendant Davis's statements. For example, after the conference on December 5, 2024, Citi published a report recapping the conference and stated that "Gardasil headwinds likely subsiding; . . . the [C]ompany highlighted plans to resolve Gardasil concerns in China along with the opportunity to tap into the male market in China and optimize other geographies."

190.   Defendants' Gardasil Stepdown Statements at ¶188 were materially false and misleading when made for the reasons set forth in ¶¶171, 178, 179, 184, 185, 187. Furthermore, Defendants gave the impression that the Gardasil 9 situation in China was improving, emphasizing that Merck and Zhifei were making "***good progress***," demand "***is stabilizing***[,]" and "***that the opportunity [in China] is still significant***[,]" when it was only getting worse — Zhifei's Gardasil sales were collapsing, Zhifei's Gardasil inventory was skyrocketing, and overall channel inventory remained unacceptably high.

### 7.    J.P. Morgan Healthcare Conference (January 13, 2025)

191.   On January 13, 2025, Defendant Davis participated in the J.P. Morgan Healthcare Conference. When asked for his "latest thoughts on what has been really the key factor and how Merck is looking to address" the factors that contributed to Gardasil's slowdown in 2024, Davis asserted that the marketplace for Gardasil in China was "***stabilizing:***"

> ***Yeah. So as we sit here today, maybe just to set context for everyone, we're seeing the situation stabilizing in the marketplace there and which is important. There's more to do. But we are very much actively working with our partner, Zhifei, to engage and drive demand and to make sure that we can continue to penetrate the female cohort that remains, which is still significant*** and importantly, as you saw

62

in the presentation, prepare for the fact that we're now going to be launching the male indication.

192.    When asked about Zhifei's "inventory situation" and "how much inventory there is to work through," Defendant Davis answered as follows: "Yeah. So I don't want to be specific to Zhifei because they're a public company. . . . But I would tell you, if you look at kind of what's happened, the trajectory over time, *in the third quarter, we did see total channel inventory, so this would include all forms, including at the CDC and the POVs and at Zhifei and others come down*."

193.    On January 14, 2025, Citi published a report recapping the conference and restated Defendant Davis's statement that Merck is seeing Gardasil stabilize in China: "Investor focus continues to be on the Gardasil concerns in China, which while the company noted more work is to be done also mentioned the situation is stabilizing." Similarly, Deutsche Bank published a report on January 14, 2025, stating that "Gardasil's China business still face some headwinds, while momentum remains strong amongst women."

194.    Defendants' Gardasil Stepdown Statements at ¶¶191-192 were materially false and misleading when made for the reasons set forth in ¶¶171, 178, 179, 184, 185, 187, 190. Furthermore, Defendants gave the impression that the Gardasil situation in China was improving, emphasizing that marketplace is "*stabilizing*" and describing "*the female cohort that remains*" as "*significant*," when it was only getting worse—Zhifei's Gardasil sales were collapsing, Zhifei's Gardasil inventory was skyrocketing, and overall channel inventory remained unacceptably high.

## VIII.    ADDITIONAL ALLEGATIONS OF LOSS CAUSATION

195.    Defendants' misstatements and omissions, and fraudulent scheme and course of conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiffs and the Class. Throughout the Class Period, Defendants made materially false and

misleading statements and omissions and engaged in a scheme and course of conduct to defraud investors. Defendants' misstatements and omissions artificially inflated and/or artificially maintained the price of Merck securities and operated as a fraud and deceit on the Class. During the Class Period, Lead Plaintiffs and the Class purchased Merck securities at artificially inflated and/or artificially maintained prices and were damaged thereby when the price of Merck securities declined when the truth was revealed and/or the risks concealed by Defendants' misrepresentations and omissions materialized.

196. The truth behind Defendants' misrepresentations and omissions and fraudulent scheme and course of conduct emerged through a series of partial disclosures, beginning on July 30, 2024.

197. When Defendants' prior misrepresentations and fraudulent conduct were disclosed to investors, the price of Merck securities dropped significantly. As a result of the disclosure of the truth of Defendants' fraud and/or materialization of the risks through the series of disclosures described below.

198. It was entirely foreseeable to Defendants that their materially false and misleading statements and omissions and fraudulent scheme and course of conduct would artificially inflate and artificially maintain the price of Merck's securities. It was also foreseeable to Defendants that the revelation of the truth about the issues described herein, or the materialization of the risks concealed by Defendants, would cause the price of the Company's securities to fall as the artificial inflation caused by Defendants' misrepresentations and fraudulent content was removed.

199. Lead Plaintiffs and other Class members suffered actual economic losses and were damaged when the foreseeable risks, including, but not limited to, the risks of the adverse impact on Merck's financial performance of decreased sales of Gardasil in China, materialized through

64

the partial disclosure of new information concerning the alleged fraud. Thus, the stock price declines described above were directly and proximately caused by Defendants' materially false and misleading statements and fraudulent scheme and course of conduct.

A.    **July 30, 2024: Q2 2024 Financial Results (*First Partial Disclosure*)**

200.    On July 30, 2024, Merck issued a press release in connection with its Q2 2024 results in which it discussed the sales of Gardasil and indicated that "[g]rowth was largely offset by lower sales in China."  It further disclosed that there were "impacts related to the lower sell out of GARDASIL from Zhifei Biological Products Co., Ltd. (the company's distributor and commercialization partner in China) into the points of vaccination in the market during the quarter." Despite these impacts, Merck continued to stress that there was "strong global demand for key growth products" and raised 2024 guidance.

201.    On July 30, 2024, during Merck's Q2 2024 Earnings Call, Defendant Litchfield announced significant, and purportedly temporary, setbacks to Merck's Gardasil sales in China as reflected in an increase in inventory at Zhifei:

> For GARDASIL, over the past few years we've benefited from extremely strong demand in China, including from the expanded indication for GARDASIL 9 to the 9- to 45-year age cohort in late 2022. **In the second quarter however, there was a significant step down in shipments from our distributor and commercialization partner, Zhifei, into the points of vaccination, compared with prior quarters, resulting in above normal inventory levels at Zhifei.** We are working closely with them to more fully understand the dynamics that caused this change. As we learn more, we will assess future shipments to our partner and work to bring their inventory back to more normal levels.
>
> **If shipments from Zhifei into the points of vaccination do not increase it is likely that we will ship less than our full year 2024 contracted doses by the end of this year.**

202.    During the question-and-answer portion of the Q2 2024 Earnings Call that followed, a J.P. Morgan analyst asked about Gardasil guidance for China in 2024, given the

65

"stepdown in 2Q[.]"  In response, Defendant Litchfield reiterated that Merck might ship less than the "contracted [] doses" to Zhifei for full year 2024:

> **[I]n terms of our guidance, we've assumed a range of scenarios, from providing the fully contracted 2024 doses during this year to providing something less than that.  If I anchor to the midpoint of our guidance, we have been measured in assuming a scenario that has less than contracted 2024 GARDASIL doses shipped to China.**

203.    An Evercore ISI analyst asked why the Gardasil market in China was contracting and whether Merck could maintain its Gardasil pricing in China. Defendant Davis revealed, contrary to prior representations, that Defendants always expected Gardasil sales women in China to flatline: "**As we look forward, . . . we have always expected that as we see the peak move through from the indication we got for the expansion of the age cohort, that you would see a flattening out over time of the demand in China, and then that, for women specifically.**"

204.    In response to a question from a Wolfe Research analyst, Defendant Davis reiterated that Merck saw a "flattening of the curve" for sales of the female indication, which was a "pretty significant" trend break:

> **So as we look at it, we do expect you will see a flattening of the curve as we see the female indication be more fully penetrated. . . .**
>
> . . . .
>
> **So the dynamics need to play themselves out.** But I think we need to first understand is what we're seeing in the quarter specific a short-term event or something else. And that's still not clear, **because I would just point that the trend break was pretty significant. It's not what we've seen in any other market that you would expect. And that's why we're a little hesitant to say this is just demand in China.**

205.    Contrary to the impression Defendants created during the Class Period, Defendant Davis, during the earnings call, also blamed the impact of the Chinese government's anti-bribery/anti-corruption investigation that had started in 2023 including criminal charges brought against a senior scientific representative of a COVID-19 vaccine manufacturer:

66

**We do believe, however, that based on the intelligence we've gathered, activity in the HPV vaccine area has been recently impacted by China's anti-bribery and anti-corruption drive** which, as you know, started really last year. **And up to that point, we really haven't seen much impact, but we do believe we are starting to see it now. And this is really driven by the fact that in the healthcare industry, there has been, as a result of this, a reduction in scientific engagement, primarily in the CDC within China, and fewer immunizations**. So, we need to tease that out more.

. . . .

. . . I'm assuming people understand when we talk about the antibribery and anticorruption what is happening. And one question that could be there is this has been going on since late last year, and we did not see impacts early on. What's changed? And how do we see it evolving? . . .

**. . . We believe some of this could be due to the fact that there was criminal charges brought against a senior scientific representative, one of the local players, related to a COVID-19 vaccine that we believe has had a dampening effect overall. And how long this lasts, how it will continue to play out we'll have to see,** but I thought I'd provide additional color because I don't want to assume that you all are aware of what really is happening there.

206.    On this news, the price of Merck's common stock declined from a closing market price of $127.78 per share on July 29, 2024, to a closing market price of $115.25 per share on July 30, 2024, *a decline of nearly 10%* in the span of a single day. The price of Merck common stock, however, remained artificially inflated as Defendants continued to mislead investors regarding, among other things, China as a growth driver for Gardasil sales.

207.    These revelations about the Q2 2024 slowdown of Gardasil sales in China came as a surprise to the investing public, and analysts responded negatively. For example, analyst reports published on July 30, 2024:

(a)     An Evercore ISI report titled "thoughts on Q, Winrevair & Gardasil inventory" on Merck's Q2 2024 earnings, underscoring that "[t]he thing to focus on in today's release is China inventory levels for Gardasil: Merck mentioned 'significant step down in shipments' from distributor in China: Zhifei. Also: 'If shipments from Zhifei do not increase, it is

67

likely that [Merck] will ship less than [its] full year 2024 contracted doses by the end of this year[.]' What exactly is the issue in Zhifei? We need color on call;"

(b)     A Jefferies report titled "MRK: Reiterate Buy on Gardasil weakness" expressing disbelief, stating: "On our end it was definitely surprising to see MRK leave so many open Q's on the call re: its growth trajectory in China over the next few years (hearing this frustration from a few investors as well);"

(c)     A Wells Fargo report titled "Valuation Argument Not Strong Enough to Ignore China Uncertainty and Lack of Catalysts; New PT $125/sh," highlighting concerns about the Company's disclosures, stating: "Gardasil China has been and was expected to be a key growth driver for the stock;"

(d)     A Barclays report titled "2Q24 Post-Call Thoughts; Lowering PT to $142," warning that investors "were left with more questions than answers" and "Gardasil overshadowed just about everything else coming out of" the call, describing the disclosures as a "seismic shift (at least for now) to the 1-2 punch of Keytruda/Gardasil that has made Merck among the easier names to own across Pharma[,]" and noting that management downplayed certain "potential explanations" for the slowdown, including "de-stocking ahead of local competitor launches" and the "weak Chinese consumer;"

(e)     A UBS report titled "2Q24 Second Opinion: Base business strength overshadowed by China Gardasil uncertainty and Winrevair launch," noting that Merck's strong Q2 2024 performance "was overshadowed largely by comments on step down of Gardasil shipments," and that "Gardasil China uncertainty [is] increasing;"

(f)    A Morningstar report titled "Merck Earnings: Steady Results as Robust Keytruda Gains Help Mitigate Gardasil Pressure," explaining that "slowing growth from . . . Gardasil . . . is likely weighing on the stock;"

(g)    A Jefferies report titled "MRK: Reiterate Buy on Gardasil weakness," noting that "we suspect Gardasil is contributing to the lion's share of the weakness;" and

(h)    A Wolfe Research report highlighting that "MRK disclosed it's possible they'll ship less doses of Gardasil than originally contracted in China in [2024] - related to order timing from their distribution partner, Zhifei. MRK said it's trying to figure out what's going on - it has some ideas."

208.    The following day, on July 31, 2024, Guggenheim published a report titled "MRK: Gardasil Slips in China; Lower PT to $138 (from $142); Maintain Buy Rating Given Upside We See From New Launches And Pipeline Optionality" stating: "We are significantly decreasing our Gardasil ex-US revenue estimates . . . , and this is the main driver of our lower price target for MRK shares." The analysts noted this reduction was based upon "the sudden nature of this news, the low visibility we have into the Chinese market, the long-term importance of Gardasil to MRK's outlook, and a likely near-term competitor entrant into this market next year[.]"

209.    That same day, analysts at Deutsche Bank published a report titled "2Q24 Results Dampened by Gardasil's Issues in China," remarking on the Gardasil disclosures as an "unpleasant surprise that dampens Merck's growth."

**B.    October 31, 2024: Q3 2024 Financial Results (*Second Partial Disclosure*)**

210.    On October 31, 2024, Merck issued a press release announcing its Q3 2024 financial results. The press release revealed that **Gardasil sales were down 11% year-over-year and that this decline was "primarily due to lower demand in China . . . ."**

211.     That same day, October 31, 2024,  Merck hosted its Q3 2024 earnings call wherein Defendants revealed that quarterly Gardasil sales to China for the quarter only amounted to approximately $500 million and that Merck expected to ship a similar amount to Zhifei for Q4 2024. This meant Merck would ship less than Zhifei's base purchase amounts for 2024 under the January 2023 Supply Agreement.  They also revealed that Merck expected Gardasil sell-through in China to continue declining in 2025. Nevertheless, Defendants continued to mislead investors, including by touting strong growth for Gardasil in China and expressing confidence that inventory levels for Gardasil in China were stabilizing and heading back down.

212.     During the Q3 2024 Earnings Call, Defendant Davis stated:

**As anticipated, results also reflect a decline in GARDASIL sales year-over-year.** Notably, however, we achieved strong double-digit growth for GARDASIL in almost every major region outside of China. **In China, consistent with the expectations we discussed on our prior earnings call, we shipped less to our commercialization partner, Zhifei and we expect fourth quarter shipments will be at a similar level to the third quarter**.

213.     During the question-and-answer portion of the Q3 2024 Earnings Call, Defendant Davis stated the following about Gardasil shipments to China:

**[A]s it relates to China specifically, and as we think about 2025, I don't want to give specific guidance because obviously, we're still working through our 2025 plan. But what I would say is we do expect to continue to see a decline in shipments into China into 2025.** And as we had highlighted before, this is happening a little bit earlier than we originally expected. **But we had always expected that over time, as we work through the bolus, we would see that the female opportunity decline** and then hopefully seeing growth come with bringing the male opportunity, which we would expect to see with approval, assuming it comes next year. So, that's how we see it progressing.

214.     During the question-and-answer portion of the Q3 2024 Earnings Call, Defendant Davis discussed Gardasil revenue expectations for China for Q4 2024:

**But given the importance and focus on GARDASIL, just to give you a sense of where we were with China, GARDASIL in the third quarter. It's about approximately $500 million in the third quarter. And as we said, we would expect to ship about the same amount in the fourth quarter. So, you should**

70

**expect that the fourth quarter itself would also be in that $500 million range. And so, that kind of gives you a sense of where we are. So, as you look forward to 2025, obviously, as we think in 2025 and over the next several years, if you're running in that $2 billion to $3 billion range,** that's why we made the comment that with that and given the other opportunities we see around the world, we remain confident in our ability to get to the $11 billion by 2030.

215.    Subsequently, Defendant Davis addressed Merck's ongoing efforts to lower Gardasil's inventory levels in China and its expectations for the vaccine moving forward:

Well, what we're talking about taking time is basically **to work down the inventory and to then build demand over time** so that we can continue to drive that market. What we're giving you is kind of what we see as the baseline of China. Our hope is that we'll do better, and we're going to put the work in to do better and to continue to drive long-term. **I think that what I'm trying to make sure everyone hears is this isn't going to be solved next quarter. It's going to take us through probably 2025**, but we're thoughtful on how we're doing it. We're working with Zhifei in a constructive manner to do it. **So, those are the elements are going to take time, because we need to build the demand**. We know the opportunity is there with 120 million females still out there to go after and with potentially 200 million males with the male opportunity.

**We have to activate that demand to make sure we can drive that business**. So, that's really what we're focusing on.

216.    On this news, the price of Merck's common stock declined from a closing market price of $104.83 per share on October 30, 2024, to $102.32 per share on October 31, 2024, a decline of approximately 2.4%. Despite these disclosures, the price of Merck common stock and options remained artificially inflated as Defendants continued to mislead investors regarding, among other things, misleadingly giving the impression that the Gardasil situation in China was improving, emphasizing that Merck was "making progress," "overall inventory levels in China" were coming down and that Gardasil demand in China was "stabiliz[ing]."

217.    Defendants failed to disclose the following adverse facts, which were known to or recklessly disregarded by Defendants:  as later revealed in Merck's 2024 Form 10-K, Defendants observed "[l]ower demand in China persisted and, at the end of 2024, overall channel inventory levels in China remained elevated at above normal levels." Inventory levels were so high at the

71

end of 2024 that it ultimately caused Merck to "temporarily pause shipments to China beginning in February 2025 through at least the middle of the year . . . ." ¶¶ 105, 230.

218.   The next day, on October 31, 2024, several analysts published reports commenting on Merck's disclosures and investor reaction to the negative news regarding Gardasil in China. For example:

(a)   A Citi report titled "Winrevair launch and Keytruda strength boo-st growth outlook" stating that "[i]nvestor focus was acutely on the Gardasil decline (11% y/y) . . . ;"

(b)   A Deutsche Bank report titled "3Q24 EPS Quick Take - Rev / EPS Beat, Quality So-So; Gardasil Top of Mind," stating "Gardasil's miss and China issues still front and center and may take some time to resolve . . . ;" and

(c)   An Evercore ISI report titled "Gardasil - interpreting the China #," emphasizing that "[b]y far the key focus in Merck earnings was Gardasil."

**C.**      **February 4, 2025: 2024 Financial Results (*Third Disclosure*)**

219.   On February 4, 2025, Merck issued a press release announcing its Q4 2024 financial results, including: (i) a 3% decline in Gardasil sales for 2024; and (ii) a 17% reduction in Gardasil sales for the quarter "due to lower demand in China." It also issued disappointing guidance for 2025 and that Merck had decided to "temporarily pause shipments of [Gardasil] into China beginning February 2025 through at least mid-year."

220.   The same day, Merck hosted its Q4 2024 earnings call ("Q4 2024 Earnings Call") wherein Defendant Davis disclosed additional Gardasil setbacks in China and the impact those had, or would have, on the Company's full year 2024 and 2025 financial results:

> **As we closed out 2024 and entered 2025, the market dynamics for GARDASIL in China have remained challenging. . . . [D]emand for GARDASIL has not recovered to the level we had expected. As a result, overall channel inventory remains elevated at above normal levels.**

In light of this, and based on further discussions with our commercialization partner, Zhifei, over the past couple of weeks, in particular regarding their most recent financial disclosure and working capital levels, **we've made the decision to take a new approach and temporarily pause shipments to China beginning this month and through at least mid-year. We believe taking this action now will facilitate a more rapid reduction of inventory and help support the financial position of our important and valued partner.**

221.    Additionally, Defendant Litchfield revealed that Merck was withdrawing its $11 billion Gardasil target for 2030, "**given the uncertain timing of an economic recovery in China.**"

222.    As a result of these shocking revelations, the question-and-answer session that followed was focused mostly on the changing market for Gardasil in China. Defendant Davis stated, in pertinent part:

We have not commented specifically on how much inventory Zhifei is sitting on. They're a public company, so we need to leave it to them to make comments about that. But I think the important point here is to understand that, as we've seen the marketplace, what we intend to do is to accelerate that drawdown. So we are planning to ship and by – frankly, **by not shipping February, potentially through the midyear and essentially longer, depending on how we see the inventory come down, we're going to allow the underlying demand that is still there to absorb the Zhifei inventory and improve Zhifei's financial position and working capital**.

**We think if we can put the inventory situation behind us, we can get to a more normal market dynamic,** one, where with the underlying demand and the fact we have the male indication coming, it can come back to growth. So the speed with which we burn that down, we'll have to see.

223.    In response to a question about when Merck expected to resume shipping Gardasil to China, Defendant Davis generally acknowledged that Gardasil inventory needed to come down "meaningfully," while also revealing that macroeconomic conditions had negatively impacted Gardasil sales in China, and that growth in China was no longer core to Merck's story going forward:

**I don't want to commit to a specific inventory level. Obviously, we need to see it come down meaningfully from where it is. And I think by taking this action**

**to stop shipments, given the demand that's there, we're going to see that happen. We just have to let it work itself through because the economy there still is soft, and that has led to the fact that we are seeing consumer demand continue to be weak**. And so as that situation resolves, I think that will determine the speed with which all of this happens.

But I think it's important to just re-emphasize going forward by rebasing this now out, this is upside. **This is not a core to our growth story going forward**. And so that is also what we want to make sure people understand. **I recognize it's a big change. And we want to do and we will do everything, we are very committed and positioned well to drive growth in China. But to me, at this point, that will be upside for the company**. And beyond that, breadth of what we have will drive the growth in Oncology, in Animal Health and with our new launches.

224. During the question-and-answer portion of the Q4 2024 Earnings Call, Defendant Davis seemingly grew frustrated with all of the questions about Gardasil in China, finally stating: "**We need to get the China situation figured out. We need to lap this market dynamic and figure out what the actual growth and opportunity is in China. And until we do that, I just want to remove this from the dialogue . . . .**"

225. On this news, the price of Merck's common stock declined from a closing market price of $99.79 per share on February 3, 2025 to close at $90.74 per share on February 4, 2025, *a decline of more than 9% in the span of a single day*, on unusually high trading volume of more than 50 million shares, compared to a daily trading average during the Class Period of approximately 14 million shares.

226. These revelations surprised the investing public and the market responded negatively as reflected in analyst commentary in reports published on February 4, 2025, including:

(a)    A BofA Securities report titled "They said what? Q4 conf call recap: Gardasil shocks again, hurts sentiment," stating: "[o]n MRK's Q4 conference call, the biggest focus naturally was the Gardasil setback (again) impacting 2025, along with withdrawn 2030 guide on Gardasil sales – we flagged previously that storm clouds were brewing with this product, and they've squarely arrived;"

74

(b)     A Goldman Sachs report titled "4Q'24 First Take: 2025 guidance below expectations on plans to pause Gardasil shipments to China," expressing surprise on Merck's shipment pause to lower inventory and Gardasil's poor performance in China:

> Notably as a new development, MRK disclosed their decision to temporarily pausing Gardasil shipments into China from February 2025 to at least mid-year. . . . The pause in shipment is meant to enable lowering of inventory levels at Zhifei and China CDCs. ***This effectively removes what had been previously messaged to be ~$2bn annual opportunity in China***, and with the prospect of minimal (January, some shipment) revenues from Gardasil in China, to potentially up to less than $1bn should shipments resume in the 2H25, we believe this to be the primary factor - now accounted for in 2025 revenue guidance, which at the midpoint is ~$2.2bn below consensus expectations for FY2025.

(c)     An Evercore ISI report titled "Thoughts on Q and guidance/Gardasil" noting that "Merck is guiding ~$2B below consensus for 2025.  Key reason: Gardasil China;" and

(d)     A Bernstein report titled "Quick Take: Merck 4Q24 continues to struggle – Gardasil remains an issue & 2025 guide shocks (below expectations)," stating: "Gardasil continued to cause Merck issues - missing on the quarter (-6.1%) and the pain continues into 2025 - with Merck indicating they are pausing all shipments for Gardasil into China until at least mid-2025[,]" and "[t]he pausing of shipments into China adds more pain & further damages credibility of management." A few days later, on February 10, 2025, Bernstein published another report, this time titled "Merck: 4Q24 - Gardasil takes the wind-out, falling into LOE territory, we expect multiples to stay in 8-10x range," noting that "Merck reported 4Q24 earnings last week and the Gardasil saga has continued to drag the stock further down."

227.     Several analysts who followed Merck also lowered their price targets in response to Merck's February 4, 2025 disclosures. For example:

(a)     On February 4, 2025, UBS published a report titled "4Q24 Second Opinion: Gardasil expectations reset on kitchen-sink guidance," in which UBS cut its price target for Merck by 12.5%, and highlighted that "communication around (and management of) Gardasil has been

underwhelming and overshadowed the name. We have now experienced three back-to-back quarters of disappointing results primarily driven by weak HPV vaccine demand in China which understandably frustrates investors and is reflected in the >$100bn market cap erased from MRK;"

(b)     On February 4, 2025, J.P. Morgan cut Merck's price target by over 10%. In a separate report, analysts at J.P. Morgan noted "the company's decision to pause shipments of Gardasil into China to work down inventory has dominated our conservations on the stock today[,]" while calling the news "clearly disappointing," and advising that "further clarity on the company's pipeline/portfolio beyond Gardasil will be needed for shares to recover[.]" And in a third report  titled "2025 First Impressions – Sales Impacted By Temporary Gardasil China Shipment Pause," the analysts underscored that "it has been difficult for inventors to look past the uncertainty on the product and today's announcement likely will not change that dynamic;"

(c)     On February 4, 2025, Morningstar presented a similar outlook "after factoring in a steep 34% Gardasil decline in 2025" and noted that "[w]e are lowering our fair value estimate to $111 per share from $120, as we expect sales of Gardasil to decline significantly in 2025 due to reduced sales in China. We see uncertainty surrounding the timing of economic recovery in China as well as US vaccine policy, and we now assume 2030 sales for Gardasil around $7 billion globally;" and

(d)     On February 5, 2025, Deutsche Bank published a report titled "4Q24: Harsh Gardasil 9 Perception Meets Reality," declaring that "Gardasil's issues in China have come to a head;"

(e)     On February 6, 2025, Wolfe Research published a report titled "Mercky waters ahead following the 4Q call" which stressed the cloudiness of Merck's Gardasil disclosures, stating: "Following Merck's 4Q earnings call on Tuesday, we continue to see the stock setup as

tricky as investors lack conviction on its ability to grow . . . particularly following mgmt. pulling Gardasil's $11B guidance target."

228.   On February 10, 2025, Merck management, including Defendants Davis and Litchfield, participated in a webinar hosted by Guggenheim to discuss, among other things, the latest developments with Gardasil. Following the webinar, Guggenheim published a report, on February 12, 2025, recapping its conversation with Merck's executives stating: "Despite a significant change in investor sentiment around Merck, management stressed again during our webinar that the only part of the business that has changed in a negative way in the last several months is Gardasil in China." Analysts at Guggenheim further noted that Defendants acknowledged that "this headwind is meaningful and material[.]"

229.   A Bloomberg article dated April 23, 2025, titled "Cheaper Chinese HPV Vaccines Turn Merck's Gardasil Boom to Bust" noted Merck's $80 billion loss in value because "Chinese demand for its top-selling HPV vaccine has dried up." The article also cited Evan David Seigerman, Managing Director and Head of Healthcare Research at BMO Capital Markets, as characterizing the China problem as a "credibility issue" and commenting: "Instead of just ripping the Band-Aid off, it was this 'We've got it,' 'We don't have it,'. . . 'That's where the problem really lies.'"

IX.   POST CLASS PERIOD EVENTS

A.   **Merck's 2024 10-K Reveals No More Growth Expected for Gardasil in China**

230.   On February 25, 2025, Merck filed its annual Form 10-K for full year 2024 ("2024 10-K"). The 2024 10-K's risk disclosures were updated, in pertinent part, to now disclose what Defendants had previously concealed - that the Company "ha[d] experienced" "slowing demand for Gardasil/Gardasil 9 in China:"

77

**Key products generate a significant amount of the Company's profits and cash flows, and any events that adversely affect the markets for its leading products could have a material adverse effect on the Company's results of operations and financial condition.**

The Company's ability to generate profits and operating cash flows depends largely upon the continued profitability of the Company's key products, such as *Keytruda*, *Gardasil/Gardasil* 9, Lynparza, *Bravecto*, and *Bridion*. In 2024, the Company's oncology portfolio, led by *Keytruda*, represented substantially all of the Company's revenue growth. In particular, in the aggregate, in 2024, sales of *Keytruda* represented 46% of the Company's total sales. As a result of the Company's dependence on key products, **any event that adversely affects any of these products or the markets for any of these products, such as the slowing demand for *Gardasil/Gardasil 9* in China which the Company has experienced, could have a significant adverse impact on results of operations and financial condition.**

. . . .

**The Company's business in China has grown in the past few years, and the importance of China to the Company's overall pharmaceutical and vaccines business has increased accordingly. In 2024, the Company experienced lower sales of *Gardasil/Gardasil 9* in China and expects that sales of *Gardasil/Gardasil 9* in China will decline significantly in 2025.**

The Company's business in China has grown in the past few years, and the importance of China to the Company's overall pharmaceutical and vaccines business has increased accordingly. Beginning in mid-2024, the Company observed a significant decline in shipments from its distributor and commercialization partner in China, Chongqing Zhifei Biological Products Co., Ltd. (Zhifei), to disease and control prevention institutions and correspondingly into the points of vaccination, resulting in above normal inventory levels at Zhifei. Accordingly, the Company shipped less than its contracted doses to Zhifei in the latter part of 2024. Lower demand in China persisted and, at the end of 2024, overall channel inventory levels in China remained elevated at above normal levels. Therefore, the Company made a decision to temporarily pause shipments to China beginning in February 2025 through at least the middle of the year and as a result, combined sales of *Gardasil/Gardasil 9* will decline significantly in 2025 compared with 2024.

(emphasis in original).

### B.    China Approves Gardasil for Males in January 2025

231.   In January 2025, the NMPA approved Gardasil 4 for use in males 9-26 years of age to help prevent certain HPV-related cancers and diseases. The approval made Gardasil the first

HPV vaccine approved for use in males in China. In April 2025, the NMPA approved Gardasil 9 for vaccination of males 16-26 years of age.

232.    CW-1 stated that he was skeptical during his tenure that approving Gardasil as a gender-neutral vaccine would boost sales in China. CW-1 explained that while Merck was successful in raising awareness in the United States and in Europe that HPV can affect both women and men, given that HPV in men is often transferred from male to male it is challenging to market it that way in China where it is not culturally appropriate to discuss HPV and same sex male relationships. Specifically, CW-1 stated that in other regions they marketed Gardasil as protecting a man's girlfriend or wife, but this would be challenging in China.

233.    Notwithstanding these male indications, which Defendants repeatedly represented during the Class Period would benefit Merck's Gardasil sales in China, Merck has not shipped any Gardasil to Zhifei since at least February 4, 2025, and Zhifei's Gardasil supply has not needed replenishment. As such, the male approval for Gardasil in China did not support the rosy picture Defendants created for overall demand in China and the ability to drive growth.

### C.    Merck Pivots Away from Gardasil as Demand in China Languishes

234.    In the months following the end of the Class Period, Defendants continued to discuss the lack of demand in China and its adverse impact on Merck.

235.    On June 10, 2025, Defendant Davis participated in the Goldman Sachs Global Healthcare Conference, during which he was asked by an analyst for "any update on China Gardasil dynamics." Davis responded by stating that he had no expectations for Gardasil in China: "As you saw in the first quarter, it continues to be a soft market and one where we continue to see inventories elevated. . . . We're going to be ready, but no expectations. We'll see what happens over time. It will be an upside surprise when it happens."

79

236.    Then, on July 29, 2025, Merck announced its Q2 2025 financial results. During the earnings call that followed, Defendant Litchfield announced that Merck's total revenues decreased 2% due to further negative Gardasil setbacks in China: "[R]esults were impacted by a decline in sales of GARDASIL in China of approximately $1.3 billion, reducing growth by 9 percentage points." Litchfield further disclosed that Merck "**will not resume [Gardasil] shipments to China through at least the end of this year [2025]**" because China's "**GARDASIL channel inventories remain elevated and demand continues to be soft**." During the question-and-answer portion of the earnings call, in response to an analyst's question about how Merck is "thinking about 2026," Defendant Litchfield admitted that "**GARDASIL China represents a fraction of our company now, much less than 1%. We're not counting on it for growth**."

237.    On October 30, 2025, Merck issued a press release announcing the Company's Q3 2025 financial results. The press release reported a 24% decline in Gardasil worldwide sales for Q3 2025 and a 40% year-over-year decline in Gardasil worldwide sales for the first nine months of 2025. The press release further noted that the "[d]ecline [was] primarily due to lower demand in China."

238.    On February 3, 2026, Merck issued a press release announcing the Company's Q4 2025 and full year 2025 financial results. The press release reported that combined worldwide sales of Gardasil declined 39%, from $8.58 billion in full year 2024 to $5.23 billion in full year 2025. During the earnings call that followed, the Company confirmed that there were no sales of Gardasil in China in Q4 2025, compared to sales of $400 million in Q4 2024, and sales for Gardasil in China for full year 2025 were $200 million compared to $3.5 billion in full year 2024. Additionally, Merck has not made any Gardasil shipments to China since January 2025.

239.    A February 3, 2026 Bloomberg article noted: "Gardasil's growth in China was once a surprising bright spot for the drugmaker, but its fortunes changed in recent years as **the shot faced competition from Chinese companies that sell HPV vaccines at one-tenth of its price**. The uncertainty around Gardasil has been a major sore spot."

240.    Zhifei's February 2026 announcements leave no doubt that the warning signs of mounting unused inventory were piling up even before the Class Period. *It is estimated that Zhifei currently has 15 million doses of unsold Gardasil inventory, eight million doses of which Zhifei is taking an impairment charge on for 2025—worth approximately $1.15 billion*. Zhifei also expects to take a massive net loss somewhere between *$1.54-$1.98 billion* for 2025 alone, marking a *600% drop* from the year prior.

## X.    ADDITIONAL SCIENTER ALLEGATIONS

241.    As alleged herein, Defendants acted with scienter throughout the Class Period, in that Defendants knew, or recklessly disregarded, that the public documents and statements made, issued, or disseminated in the name of the Company or in their own names, were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of or access to information reflecting the true facts regarding Merck, their control over, or receipt, or modification of Merck's allegedly misleading misstatements and omissions, were active and culpable participants in the fraudulent scheme alleged herein.

242.    Defendants knew or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The fraud described herein could not have been perpetrated throughout the Class Period without the knowledge and

complicity, or at least the reckless disregard, of Merck personnel at the highest levels of the Company.

243. The Individual Defendants permitted Merck to release these false and misleading statements and failed to file the necessary corrective disclosures, which artificially inflated or artificially maintained the price of Merck securities throughout the Class Period.

244. As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Merck, their control over, receipt of, and/or modification of Merck's allegedly materially misleading statements and omissions, and/or their positions with the Company that made them privy to confidential information concerning Merck, participated in the fraudulent scheme alleged herein.

245. The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Merck securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public regarding Merck's business, operations, and management as well as the intrinsic value of its securities, and caused Lead Plaintiffs and members of the Class to purchase Merck securities at artificially inflated or artificially maintained prices.

**A.    Senior Merck Executives, Including the Individual Defendants, Closely Monitored Gardasil Sales, Demand, and Inventory Levels in China**

246. Throughout the Class Period, the Individual Defendants, spoke frequently about their access to information and visibility into key data concerning demand for Gardasil in China, including Zhifei's Gardasil sales and inventory and the inventory levels at China CDCs and POVs.

247. For example, following a discussion with Defendant Romanelli, Goldman Sachs published a report on August 5, 2024, and reported that Merck's internal sales data system regularly receives data from Zhifei's inventory management system, which enables Merck to track

the amount of Gardasil that Zhifei sells to China CDCs. When such sales occur, Zhifei also updates Merck so Merck can track the sell-through at the CDCs and POVs. Merck receives the sell-through data with approximately a two-to-four week lag time. Goldman Sachs stressed that this system allows Merck to "closely monitor product levels in the channel each month - including what amount of product is at the CDCs and at the POVs" and that "the aggregation of monitoring data points provid[es] the company with an overall sense for volume dynamics."

248.    Additionally, on September 5, 2024, at Morgan Stanley's Healthcare Conference, Defendant Davis confirmed that Merck "*ha[s] a good understanding of the dynamics of what's happening in China. We are very focused on it, from me, from Caroline, our CFO*, all the way down to our commercial organization . . . ."

249.    During the September 18, 2024 Bank of America Global Healthcare Conference, Defendant Romanelli confirmed: "*The other thing we look very closely at is the volume in the CDCs and the POVs*."

250.    On October 31, 2024, during Merck's Q3 2024 Earnings Call, Defendant Davis confirmed that Merck had been watching "*overall channel inventories of GARDASIL*" and "*reductions in the CDCs and the points of vaccination*," which helped the Company assess demand in real-time for Gardasil in China, and balance Zhifei's inventory levels.

251.    On November 13, 2024, at the UBS Healthcare Conference, while discussing Gardasil's declining sales in China, Defendant Oosthuizen reiterated: "*I think we have a good grip and understanding of what's the situation with inventory at POVs, CDC and with our partner Zhifei in China*."

252.    Then, on December 5, 2024, at the Citi Healthcare Conference, in response to an analyst requesting an update on Gardasil in China, Defendant Davis confirmed that Merck was

working with Zhifei to monitor demand and sell-through: "And obviously China itself, we have seen the slowdown that's happening there. ***We understand the fundamentals of what's happening. We are very focused on that with our partner Zhifei,*** making good progress and bringing incremental resources to bear to drive and activate demand."

253.   On January 14, 2025, at the J.P. Morgan Healthcare Conference, Defendant Davis again confirmed Merck was closely monitoring inventory levels at China CDCs which remained elevated in Q4 2024: "[I]in the third quarter, ***we did see total channel inventory. So this would include all forms, including at the CDC and the POVs and at Zhifei and others come down.*** In the fourth quarter, we've not seen it come down. It's kind of held where it was still at an elevated level.  So we're going to have to see that do better as we move into 2025."

254.   Merck executives also confirmed that Zhifei and Merck "work[] hand in hand" and met as often as weekly to discuss sales strategy, inventory status, and marketing efforts.

255.   Specifically, Defendant Romanelli noted, on September 18, 2024, at the Bank of America Global Healthcare Conference:

> So, we worked very closely with Chairman Jiang. We have a great relationship with Chairman Jiang, worked closely to make sure that we improve the reach in the marketplace, both FTEs or sales reps in the market…. So, I would say from a Zhifei perspective, we've been working hand in hand. ***We have weekly meetings with Chairman Jiang and his team.*** We have a new business unit director in the market working with my managing director in the market to make sure that we're all on the same page and going after the same solution.

256.   Similarly, Defendant Davis stated, on July 30, 2024, during Merck's Q2 2024 Earnings Call:

> What's unclear to us, and what we're trying to understand, is that during the second quarter, we saw a significant stepdown in shipments from Zhifei to the points of vaccination. The reductions during the second quarter was surprising and, I would point out, was a meaningful departure from prior trends we've seen both throughout, really, all of 2023 and into the first quarter of 2024. So, as we look at this, we're wanting to understand what would cause the trend break we saw. And I can tell you what we know as of now is we believe there could be multiple factors

that may be contributing to this dynamic, ***and we're working closely with our partner to try to tease out what exactly is happening***.

257.    That same day, during Merck's Q2 2024 Earnings Call, Defendant Litchfield stated that Merck tracked data for "the whole HPV market in China" and that Merck was able to see "a significant step-down in shipments from Zhifei to the points of vaccination" which "result[ed] in above normal inventory levels at Zhifei."

258.    Former Merck employees also confirm that Merck had access to Zhifei inventory levels in China.

259.    According to CW-5, Merck maintained information about Gardasil inventory levels in its SAP system. CW-5 explained that this system was created by Merck's Supply Chain Management (SCM) team and that it was a complex system. CW-5 stated that because Gardasil's distribution system was controlled internally by Merck, the SCM team had access to Gardasil inventory levels in China.

260.    According to CW-4, detailed data and metrics were kept and consistently updated in Merck's "very advanced" SAP system on each Merck drug and vaccine from each country, and these data and metrics included sales, forecasting, manufacturing, "tendencies," inventory, and supply chain.

261.    In addition to receiving Zhifei's data, Merck posted its own regional managers across various regions in China to assess inventory at channel endpoints, like CDCs and POVs, to verify the veracity of Zhifei's data.

262.    Merck also purchased sales data from third-party companies, including Pharber, which showed, among other things, vaccines at points of vaccination (POV) including district CDCs and community health service centers.

85

**B.    MSD and Merck Executives, Including the Individual Defendants, Met to Discuss Trends in China**

263.    The Business Unit Heads at MSD China held regular internal meetings on strategic planning for Gardasil sales in China and gave periodic briefings to senior leadership at Merck headquarters. Based on the data Merck headquarters received, they evaluated Gardasil demand and determined whether and how to adjust Gardasil production.

264.    CW-4 recalled Merck's General Managers and Business Unit Directors for each country as knowing and/or having access to these updates, that Merck was very robust and detailed in "tracking everything" and updated that information in SAP, and that the General Managers provided these updates possibly in the form of spreadsheets and presentations to the C-suite in corporate headquarters.

265.    According to CW-5, it takes 6 to 12 months for Merck to produce Gardasil vaccines. CW-5 stated that the Company had to project Gardasil customer demand at least 6 to 12 months in advance.

266.    According to CW-4, "We closely looked over our manufacturing numbers," and explained that Sanat Chattopadhyay (President, Manufacturing) updated CEO Robert Davis on a regular basis in the form of presentations consisting of updates pulled from the SAP. According to CW-4, "risks were communicated to the C-Suite." CW-4 recalled that Merck used another system for procurement, which he thought was called Comet, adding that it was part of the SAP.

267.    CW-4 described CEO Robert Davis as "a very hands-on CEO with targeted markets for growth." CW-4 suggested that along with the regular manufacturing updates, Davis would have been receiving regular updates from Sanat Chattopadhyay in sales, forecasting, inventory, and global supply chain after Chattopadhyay received such updates from the Senior Vice

86

Presidents leading each of those respective departments.  CW-4 described Davis as "especially hands-on" with larger markets such as China, India, and Brazil.

268.    CW-4 explained that given how (i) robustly and fulsomely the Company tracked sales, forecasting, inventory, manufacturing, "tendencies," and supply chain; (ii) how "hands-on" Davis was; and (iii) the regular updates he was given, that it was unlikely that he would not have been aware of any problems developing in one of Merck's largest markets, China.

### C.    Gardasil was at the Core of Merck's Business and the Individual Defendants Spoke Frequently About the Importance of Gardasil in China

269.    Before and during the Class Period, Gardasil sales represented Merck's second highest grossing product, with China becoming the largest market for Gardasil in the world.  ¶¶4, 49.  At the start of the Class Period, Gardasil sales in China were the second largest growth area of Merck's business and made up between 60% to 70% of Gardasil international sales and approximately 50% of overall Gardasil sales. ¶51.  From the start of 2018 through the end of 2023, Merck's annual sales grew by approximately $20 billion, almost 28% of which was driven by Gardasil's success.

270.    Accordingly, in every quarterly earnings presentation by Merck, the Company included slides which underscored that its overall vaccine sales were led by Gardasil and demand for Gardasil in China.

271.    Additionally, prior to and throughout the Class Period, the Individual Defendants spoke frequently about the importance of Gardasil for Merck, especially the importance of sales and demand for Gardasil in China, demonstrating both their familiarity with the subject and the fact that Gardasil's demand in China was a core part of Merck's business. For example:

(a)    On October 27, 2022, during Merck's Q3 2022 Earnings Call, Defendant Litchfield stated: "So GARDASIL continues to be a very strong growth driver for our company[.]"

(b)    On January 9, 2023, during the 41st Annual J.P. Morgan Healthcare Conference, Defendant Davis stated, "[w]e've talked about starting with the vaccines business, which is really anchored in our product, GARDASIL, that, that product will continue to grow meaningfully. And in fact, we expect it to more than double off of 2021 sales. So that – if you look forward, what that means is growth in excess of $11 billion by 2030;"

(c)    On February 24, 2023, Merck's 2022 Form 10-K, signed by Defendants Davis and Litchfield, stated, "[t]he Company's ability to generate profits and operating cash flow depends largely upon the continued profitability of the Company's key products, such as Keytruda, Gardasil/Gardasil 9, Lynparza, Bravecto, and Bridion;"

(d)    On April 3, 2023, Merck's 2023 Proxy Statement noted: "Our vaccines business remains a key growth pillar, anchored by our HPV vaccines GARDASIL and GARDASIL 9. We expect our vaccines to continue growing substantially, potentially more than doubling 2021 sales and generating over $11 billion in revenue by 2030;"

(e)    On October 26, 2023, during Merck's Q3 2023 Earnings Call, Defendant Litchfield stated: "Our vaccines portfolio delivered strong growth, led by GARDASIL, which increased 16% to $2.6 billion, driven by underlying global demand, particularly in China." Later in the call, Defendant Davis stated, in response to an analyst question on future growth opportunities for Gardasil, that "we feel very proud of GARDASIL . . . as we look at the business going forward, I would start by saying we remain very confident that this is a business that's going to continue to grow and that we will achieve the expectation we've communicated of over $11 billion in revenue by 2030. So nothing has changed in how we see the business;"

(f)    On January 4, 2024, in response to a question at the Goldman Sachs Healthcare C-Suite Unscripted Conference, Defendant Davis stated: "With GARDASIL as a

88

foundation, we continue to believe it will be in excess of $11 billion as we approach 2030, which is the guidance we've given. So each of those, as you point out, are important building blocks;"

(g)     On January 8, 2024, during the J.P. Morgan Healthcare Conference, Defendant Davis stated that "we expect to continue to do quite well into 2024 . . . with our vaccines business based on GARDASIL as the foundation . . . " Later in the call, in responding to an analyst question about 2024 guidance, Davis assured the analyst that "GARDASIL is continuing to do quite well and will continue to be a growth driver;"

(h)     On February 1, 2024, during Merck's Q4 2023 and full year 2023 Earnings Call, Defendant Litchfield stated that the "[v]accines portfolio delivered excellent growth led by GARDASIL, which increased 27% to $1.9 billion, driven by global demand, particularly in China."

(i)     On February 26, 2024, Merck's 2023 Form 10-K, signed by Defendants Davis and Litchfield, stated: "In 2023, the Company's oncology portfolio, led by Keytruda, and its vaccines portfolio, led by Gardasil/Gardasil 9, represented substantially all of the Company's revenue growth. In particular, in the aggregate, in 2023, sales of Keytruda and Gardasil/Gardasil 9 represented 56% of the Company's total sales;"

(j)     On March 5, 2024, during the TD Cowen Healthcare Conference, Defendant Romanelli stated that Merck "still ha[s] a lot of opportunity" with growing Gardasil, China is Gardasil's "largest market," and " . . . we continue to see, as an opportunity, we continue to view that by 2030, it would be greater than $11 billion;"

(k)     On April 25, 2024, during Merck's Q1 2024 Earnings Call, Defendant Litchfield emphasized that Merck's "vaccines portfolio delivered strong growth, led by

89

GARDASIL . . . " and that "[o]ver the near and long term, we remain confident in our ability to protect many more people from HPV-related cancers and drive growth of GARDASIL;"

(l)    On May 15, 2024, during the Bank of America Healthcare Conference, Defendant Litchfield stated that "we feel very confidently about our GARDASIL business and its outlook going forward . . . " and that "[a]s it pertains to China, China is a large market, and today… the opportunity to provide further protection is still huge;"

(m)    On July 30, 2024, in response to a question on Gardasil's future prospects during Merck's Q2 2024 Earnings Call, Defendant Davis stated that "as we look forward, our belief in China being a significant contributor is unchanged . . . ;"

(n)    On October 31, 2024, during Merck's Q3 2024 Earnings Call, Defendant Davis stated that while Merck normally did not publicly disclose its "product level guidance or specifics on a quarterly basis," Merck was providing guidance for Gardasil in China at that time "given the importance and focus on GARDASIL;" and

(o)    On February 4, 2025, in response to questions on Gardasil's declining demand in China and the prospect of a potential recovery during Merck's Q4 2024 Earnings Call, Defendant Davis admitted that Gardasil was previously, but no longer, "a core to our growth story," which represented "a big change" for the Company.

> **D.    Former Merck Employees Confirm that Defendants Knew or Recklessly Disregarded that Gardasil Vaccination Levels were Approaching a Market Saturation Point by the Start of the Class Period**

272.    The witnesses' accounts detailed herein confirm that Defendants knew or recklessly disregarded that by the start of the Class Period, female demand for Gardasil in China was reaching a saturation point and would decline permanently.

273.    During the summer of 2022, Merck learned from a consultant that Chinese consumers were changing their spending behaviors and beginning to prefer local products over

multinational products like Gardasil. ¶¶78-82. Indeed, Chinese consumers were becoming more cost conscious and no longer viewed multinational brands as superior to local alternatives. *Id.*

274. Defendants knew that Chinese brands were developing domestic low-cost HPV vaccines and the Company discussed the effects of this growing local competition on Gardasil sales in China. ¶59.

275. By the start of the Class Period, China's August 2022 female age eligibility expansion for Gardasil had run its course, meaning, even for the added ages, Merck had largely vaccinated the females who could afford and wanted to take the Gardasil vaccine. ¶¶46, 77-98, 103. Thus, Merck could not drive further growth in China among females ages 9-45 years old. *Id.*

276. Merck's ability to expand into China's lower-tier cities was being adversely impacted by its significantly cheaper competition in those lower-tiered cities. ¶¶54, 57-60.

277. The slowdown in the Chinese economy was also adversely impacting Gardasil sales in certain regions in China – namely the lower-tiered cities. ¶¶56, 82, 221, 223.

278. In October or November 2023, as demand in China for Gardasil deteriorated, Merck attempted to offload millions of Gardasil doses intended for China to other markets. ¶¶ 87-91.

279. By the end of 2023, Merck observed that China did not use as much Gardasil 9 in 2023 as initially projected and signs that the Chinese market was deteriorating — demand was declining and inventory was growing. Thus, the Company was considering reversing course and ramping down its production of alum for 2024. In January 2024, the Company decided to substantially reduce its production for the year due to Gardasil demand in China continuing to decline. ¶¶99-102.

E.    **Defendants Admit During and After the First Partial Disclosure on July 30, 2024 That They Always Expected the Saturation of the Female Gardasil Market in China**

280.    Throughout the second half of 2024, the Individual Defendants, admitted that they "always" knew that female demand for Gardasil in China would hit a saturation point. For example:

(a)    On July 30, 2024, when asked during Merck's Q2 2024 Earnings Call about the future performance of Gardasil in China, Defendants Davis and Litchfield revealed, in direct contrast to prior statements, that the declining structure of the January 2023 Supply Agreement specifically contemplated Merck's expectation of saturation of the female market in China as well as the emergence of a 9-valent competitor:

> Davis: … As we look forward, and Caroline can comment specifically, *we have always expected* that as we see the peak move through from the indication we got for the expansion of the age cohort, that you would see a flattening out over time of the demand in China. And then that, for women, specifically, and then we would bring on the male indications that should allow us then to continue to drive the business forward from there. Nothing has changed in that dynamic in what we're seeing right now….

> Litchfield: So what I would add is *we have always contemplated* that we would have a 9-valent competitor within the Chinese market. As such, the current contracted doses with Zhifei for 2025 are less than what the contract is for 2024, as we would expect to participate in that market but understand a competitor would likely gain share in that market….

(b)    On September 18, 2024, Defendant Romanelli reiterated: "*We've always anticipated* that from 2024, we would have a reduction in the shipments based on the [Zhifei] contractual volume or to actual dollars that were put into that contract out to 2026…."

(c)    On October 31, 2024, during Merck's Q3 2024 Earnings Call, Defendant Davis repeated: "*[W]e had always expected* that over time, as we work through the bolus, we would see that the female opportunity decline . . . ."

92

(d)　　On November 13, 2024, Defendant Oosthuizen confirmed: "And I think that brings me to an important point. I think with China, *we always knew* that the bolus will start to be worked through in China in terms of the female vaccinations and that we will start to see a slowdown, especially on the female side in China and that it will shift more volume into the rest of the world."

(e)　　On November 21, 2024, in response to a question on Gardasil's trajectory in China, Defendant Romanelli noted that since Gardasil's launch in China in 2018, "[o]ver that time, *we knew* that we would get to the bolus of female patients. . . . So, *we always knew* that at some point, we would start to trail off as we expand into Tier 3, Tier 4, Tier 5 cities and we would bring in the male indication. And so, what did change is kind of the timing around that."

**F.　　The Individual Defendants' Class Period Stock Sales Support an Inference of Scienter**

281.　　The Individual Defendants' sales of Merck stock during the Class Period are set forth below:[11]

| Merck Insider | Shares Sold | Proceeds |
|---|---|---|
| Robert M. Davis (Chief Executive Officer) | 235,021 | $29,538,588 |
| Caroline Litchfield (Chief Financial Officer) | 38,291 | $4,805,521 |
| Jannie Oosthuizen (President of Merck's Human Health U.S. division) | 21,040 | $2,624,172 |
| Joseph Romanelli (President of Merck's Human Health International division) | 1,000 | $124,888 |
| **TOTAL** | **295,352** | **$37,093,579** |

---

[11] To evaluate Individual Defendants' selling activity, Lead Plaintiffs used publicly available trading data that these Defendants are required to report to the SEC on Form 4. Lead Plaintiffs analyzed the Individual Defendants' trading during the Class Period (between October 26, 2023 and February 3, 2025, inclusive), as well as their trading history preceding the Class Period. The Forms 4 filed during the Class Period are hereby incorporated by reference, and *a summary of the Class Period stock sales are set forth in Appendix A, annexed hereto.*

282.    Notably, almost all of these Class Period stock sales were suspiciously timed in the first two weeks of February 2024. As a result of these February 2024 trades, totaling approximately $37 million, the Individual Defendants personally benefited from their false statements and omissions of material fact and their course of conduct to artificially inflate the price of Merck's common stock and options during the Class Period. Notably, these insider sales occurred at a critical juncture of the Class Period—when Merck's common stock was at its highest artificially inflated prices, before the first partial disclosure alleged herein was made which triggered a decline in the price of Merck's common stock.

283.    None of the Individual Defendants' insider sales during the Class Period were made pursuant to Rule 10b5-1 trading plans and all the trades were executed in direct contravention of Merck's Insider Trading Policy,[12] which was effective at the time of the transactions.

284.    Merck's Insider Trading Policy applies to all Merck employees, including the Individual Defendants, and states the following, in relevant part:

> As employees of Merck & Co., Inc., Rahway, NJ, USA known as MSD outside the United States and Canada (our Company), we, our family members and related persons do not trade in our Company securities – or tip others to do so – based on material, non-public (or "inside") information. We recognize that insider trading undermines investor confidence in the fairness and integrity of the securities markets, and is not only unethical, but also illegal.
>
> . . . .
>
> Know the definition of inside information and the types of information that could be considered inside information. Be alert to situations that are governed by this policy – it applies when buying or selling securities, including common stock, options for common stock, any other securities that our Company may issue or that may be issued by other companies, or any instruments that may be based on securities issued by our Company or other companies.
>
> . . . .

---

[12] Merck & Co., Inc., Annual Report (Form 10-K) (Feb. 26, 2024), Exhibit 19 INSIDER TRADING POLICY ("Merck's Insider Trading Policy").

Protect inside information. Don't trade on it and don't tip others who could trade on it. Follow not only the letter, but the spirit of the laws and policies in the countries where we do business and seek help anytime you have a question. Know and adhere to the following key operating principles of this policy[.]

. . . .

To ensure compliance and avoid liability, if you possess inside information, don't trade until the beginning of the second full trading day after information has been communicated to the public through an official announcement, even if you no longer work at the Company. In addition, if your role at our Company exposes you to inside information regarding any matter reasonably likely to be a focus of the Company's quarterly or annual earnings releases or related earnings calls (e.g., the Company's financial or operating results or future outlook), don't trade in our Company stock during any blackout period, other than automatic purchases under Company-sponsored plans.

### 1. The Individual Defendants Suspiciously Sell Stock in February 2024 Before the First Partial Disclosure at Class Period Price Highs

285. In coordinated stock trades furthering the scheme alleged herein, the Individual Defendants exploited the Company's artificially inflated stock price by selling Merck shares in February 2024. They profited handsomely from this well-timed trading, with realized collective proceeds of approximately $37 million at prices up to $127 per share. Moreover, as set forth below, Defendants Davis and Litchfield sold a significant percentage of their personal Merck stockholdings in these Class Period trades.

286. At the time of their sales, the Individual Defendants had strong visibility of Zhifei's Gardasil sales and inventory levels. *See* Sections X(A), X(B). The data demonstrated that Zhifei's Gardasil sales had dramatically declined during January 2024.

287. The Individual Defendants and Sanat Chattopadhyay (EVP and President, Merck Manufacturing) were all members of Merck's Executive team. As part of the Executive team, the Individual Defendants managed the day-to-day operations of the Company. Additionally, Defendant Davis was updated on manufacturing changes on a weekly basis and was "especially hands-on" with larger markets such as China. ¶¶266-268.

95

288.    By October or November 2023, the Individual Defendants were aware that China was overstocked with Gardasil because of declining customer demand for Gardasil in the Chinese market, causing Merck to solicit other countries within Merck's network to purchase excess Gardasil at a discounted rate. ¶¶87-91. Subsequently, by January 2024, Defendants were also aware that Merck substantially lowered its manufacturing plans for Gardasil 9 for the rest of the year due to a "significant" decline in demand for the vaccine in China. ¶¶99-102.

289.    While armed with this information, between February 2, 2024 and February 14, 2024, the Individual Defendants synchronously unloaded some of their Merck holdings while the Company's artificially inflated stock price approached Class Period highs.

**2.    The Nominal Amount and Percentage of Merck Stock Sold During the Class Period by Defendants Davis and Litchfield Was Substantial and their Trading Was Inconsistent with Prior Trading Practices**

290.    Defendants Davis and Litchfield's proceeds from shares sold during the Class Period were especially large and inconsistent with their prior trading practices.[13]

291.    On February 13 and 14, 2024, Defendant Davis offloaded 235,021 shares of his personal holdings of Merck stock for proceeds of over $29.5 million and profits of over $12 million. *See* Appendix A. These sales were the result of exercising options and then immediately selling all the resulting shares. Through these transactions, Davis disposed of approximately 27% of the total shares that he had available for sale at that time, including the options he exercised. At the time, Davis's insider sales on those two successive days (February 13 and 14, 2024) were the

---

[13] Unlike Defendants Davis and Litchfield, Defendants Romanelli and Oosthuizen's stock sales during the Class Period were smaller in size than their sales during the year before the Class Period.

largest stock sales during his employment by Merck by volume and value:



292.     In comparing Defendant Davis's Class Period sales with his sales in 2023 and 2022, which were also executed upon the exercising of options, Davis sold 143,329 (61% of the volume of his Class Period sales) on April 28, 2023 for $16.5 million, and 167,613 shares on November 9, 2022 (71% of the volume of his Class Period sales) for $17.2 million. Davis sold substantially more shares in two days during the Class Period for almost *double* the proceeds than either of the trading days in 2022 or 2023.

293.     On February 14, 2024, Defendant Litchfield sold 38,291 shares of Merck stock for proceeds of over $4.8 million and profits of over $2.5 million. *See* Appendix A. Her sales were also the result of exercising options and selling all of the resulting shares. Through this transaction, Defendant Litchfield disposed of approximately 14% of the total shares that she had available for sale at that time, including the options she exercised. At the time, Defendant Litchfield's insider sale on February 14, 2024 was the only—and therefore largest—stock sale she has made during her employment at Merck by volume and value.

294.    As displayed below, Defendants Davis and Litchfield's insider sales were perfectly timed to capitalize on Merck's artificially inflated stock price as their scheme unfolded:





295.    The Individual Defendants' Class Period stock sales, taken together and given their suspicious timing in February 2024, at the height of Merck's Class Period stock price, but before the disclosures, support a strong inference of scienter.

G.      **Merck Admitted Early in the Class Period that Neither the Ongoing Economic Slowdown nor the Anti-Bribery/Anti-Corruption Campaign Being Conducted by the Chinese Government Were Affecting Gardasil Demand in The Company's Target Private Market**

296.    On July 21, 2023, the Chinese government launched a national campaign against corruption which targeted the healthcare industry (*e.g.*, hospitals, pharmaceutical industry and insurance funds). Soon after, the National Health Commission ("NHC"), the Central Commission for Discipline Inspection ("CCDI") of the Chinese Communist Party ("CCP") and various central and local government agencies ramped up their regulatory enforcement efforts to eradicate corruption in the healthcare sector.

297.    In December 2023, the NHC announced that the anticorruption campaign had been extended to October 2026. At the end of that month, the National People's Congress then amended the PRC Criminal Code to increase the penalties, of up to life imprisonment, for bribe-givers in the healthcare sector. Local governments were also given the authority to assign "unethical ratings" to pharmaceutical companies and restrict them from selling drugs on certain platforms or submitting tenders.

298.    This campaign resulted in various ramifications within China's healthcare industry, including: (1) at least 200 high-ranking government officials, CCP secretaries and hospital directors being investigated, detained, or voluntarily surrendered themselves to authorities regarding corruption charges in 2023; (2) market administration regulators fining companies for providing improper benefits to healthcare professionals (*e.g.*, kickbacks, entertainment/hospitality & unjustified speaker fees), engaging in collusive bidding, and fabricating sales records; (3) several sales reps of multinational pharma companies being prosecuted and sentenced for defrauding government medical insurance; (4) hospitals, pharmacies, and healthcare professionals being fined or investigated for charges such as issuing unreasonable prescriptions for medical

99

examinations or drugs and switching products covered by medical insurance; and (5) CDCs being directed to de-stock vaccines and reduce vaccine inventory on-hand.

299.    Notwithstanding, on November 8, 2023, when asked directly whether the ongoing economic slowdown and anti-corruption crackdown in China were affecting Merck's Gardasil sales in China, Defendant Oosthuizen, unequivocally stated the government investigation was "a good thing for business" and was a way to create an even playing field. Oosthuizen also confirmed that the economic slowdown in China was not negatively affecting Merck because Merck's business was in "the private segment . . . less affected by public funding, government spend:"

> Trung Huynh: Yeah. Okay. And perhaps an unfair question because you're President of Human Health in the US, but China, Merck is one of the bigger players in China. We've seen a significant slowdown in the Chinese economy there. Have you seen any kind of impact to Merck? And there's also crackdown on regulations.

> Oosthuizen: Yeah. I mean, on the anti-corruption drive, we think that's a good thing for business. I think that's – and my counterpart, Joe Romanelli, who actually managed China, now is leading international do believe that that will help to create an even playing field, which we think is good for business but it's also good for patients, right, that decisions are made in the interest of what is best for patients and not for any other reason.

> So, in terms of the economic slowdown, I mean, that's been ongoing for a while. We haven't seen it in our business for the most part because our business is pretty much in the private segment. So it's less affected by public funding, government spend and I think it's also indicative of the value that KEYTRUDA as well as GARDASIL, in particular, bring to the Chinese population as well as JANUVIA in terms of diabetes. But our business is mostly in the private segment, so less affected, I guess, by government constraints at this point.

300.    Only nine months later, when Defendants were forced to admit that Gardasil sell-through in China was significantly down, Merck claimed that the Chinese government's ongoing anti-corruption investigation and criminal charges brought against a senior scientific representative from a domestic COVID-19 vaccine manufacturer may have tempered demand in the whole vaccine market in China. But this was inconsistent with Oosthuizen's earlier representation that

Gardasil sales in the private market by patients paying for Gardasil out of pocket was not affected by the government's anti-corruption investigation or the economic slowdown in the country.

## XI.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

301.    To the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Company, and/or engaged in a fraudulent scheme or course of conduct, Lead Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

302.    Further, Lead Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    Defendants' omissions and misrepresentations were material;

(c)    the Company's common stock and options traded in an efficient market;

(d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)    Lead Plaintiffs and other members of the Class purchased Merck securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

303.    At all relevant times, the market for Merck securities was efficient for the following reasons, among others:

(a)    As a regulated issuer, Merck filed periodic public reports with the SEC;

(b)    Merck regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the

major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(c)     Merck was followed by several securities analysts employed by major brokerage firm(s) who published reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

(d)     Merck securities were actively traded on the NYSE.

304.    As a result of the foregoing, the market for Merck securities promptly digested current information regarding Merck from all publicly available sources and reflected such information in Merck's stock price. Under these circumstances, all purchasers of Merck common stock and/or call options or seller of put options during the Class Period suffered similar injury through their purchase at artificially inflated prices and the presumption of reliance applies.

## XII.    NO SAFE HARBOR; INAPPLICABILITY OF BESPEAKS CAUTION DOCTRINE

305.    The statutory safe harbor provided by the PSLRA (15 U.S.C. § 78u–5, the "Safe Harbor") applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint. The statements complained of herein were historical statements or statements regarding current facts and conditions at the time the statements were made. Further, to the extent that any of the false or misleading statements alleged herein could be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

306.    Alternatively, to the extent the Safe Harbor otherwise would apply to any forward-looking statements pleaded herein, Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements was made, the speakers knew the

102

statement was false or misleading, or the statement was authorized or approved by an executive officer of Merck who knew that the statement was materially false or misleading when made.

307. Additionally, the risk disclosures included in Merck's public filings were inadequate, obfuscated the truth, and did not inform investors of the true facts and actual risks already occurring.

## XIII. CLASS ACTION ALLEGATIONS

308. Lead Plaintiffs bring this Action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of a Class consisting of all persons and entities who or which purchased or otherwise acquired the publicly traded common stock or exchange-traded call options or sold exchange-traded put options of Merck during the Class Period (the "Class"), and were damaged thereby. Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Individual Defendant; (iii) any person who was an officer, director, and/or control person of Merck during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling or beneficial interest; (v) Merck's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person or entity, in their capacities as such.

309. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Merck's common stock was actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can be ascertained only through appropriate discovery, Lead Plaintiffs believe that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Merck or its transfer agent and may be notified of the pendency of this Action by mail, using the form of notice similar to that customarily used in

securities class actions. As of September 30, 2025, there were approximately 2.49 billion shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals and entities located throughout the world. Joinder would be highly impracticable.

310. Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

311. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Lead Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

312. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether the Exchange Act was violated by Defendants' acts as alleged herein;

(b) Whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;

(c) Whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) Whether the Defendants caused the Company to issue false and misleading filings during the Class Period;

(e)    Whether Defendants acted knowingly or recklessly in issuing false filings;

(f)    Whether the prices of Merck securities during the Class Period were artificially inflated or artificially maintained because of the Defendants' conduct complained of herein; and

(g)    Whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

313.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this Action as a class action.

## COUNT I

### Against All Defendants for Violations of
### Section 10(b) and Rule 10b-5(b) Promulgated Thereunder

314.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

315.    This Count is asserted against Defendants based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5(b) promulgated thereunder by the SEC.

316.    During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

317.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b) in that they:

(a)    Employed devices, schemes and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of Merck common stock and/or call options or their sale of put options during the Class Period.

318.    Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated in or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.  These Defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

319.    The Individual Defendants, who are or were senior executives and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Lead Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain

106

and disclose the true facts in the statements made by them or other Merck personnel to members of the investing public, including Lead Plaintiffs and the Class.

320.    As a result of the foregoing, the market prices of Merck common stock and options were artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Lead Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of Merck common stock and options during the Class Period in purchasing Merck securities at prices that were artificially inflated as a result of Defendants' fraudulent scheme and material misrepresentations.

321.    Had Lead Plaintiffs and the other members of the Class been aware that the market price of Merck securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Merck common stock and/or call options or sold put options at the artificially inflated prices that they did, or at all.

322.    As a direct and proximate result of the wrongful conduct alleged herein, Lead Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

323.    By reason of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder and are liable to the Lead Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of Merck common stock and/or call options or sale of put options during the Class Period.

## COUNT II

### Against All Defendants
### for Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a)/(c) Promulgated Thereunder

324.   Lead Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

325.   This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5(a) and Rule 10b-5(c) promulgated thereunder by the SEC, on behalf of Lead Plaintiffs and the Class, against all Defendants.

326.   Throughout the Class Period, Defendants engaged in a fraudulent scheme, practice or course of business which operated as a fraud and deceit upon investors. Specifically, Defendants' course of business throughout the Class Period was to conceal the true state of Merck's Gardasil business and growth opportunities in China to instill a false belief that the untapped market in China was and would continue to be a driver of revenue growth for the Company for years to come. This false belief was perpetuated by both the totality of the false and misleading statements alleged herein taken collectively, and the totality of Defendants' acts collectively creating a false perception regarding Gardasil's prospects in China.

327.   Throughout the Class Period, Defendants' fraudulent scheme involved,  among other things (i) participating in conference calls where they concealed and/or downplayed the lack of demand in China for Gardasil in presenting the state of Merck's business and in response to analyst questions; (ii) signing or authorizing SEC filings and other materials on behalf of Merck that did not disclose the existing problem with the lack of demand in China including the saturation of the Chinese market and the negative impact of cheaper competitor offerings; and (iii) artificially inflating the price of  Merck stock so that Defendants could profit handsomely from insider sales in violation of Company policy.

328.    Defendants directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to perpetrate this fraud.

329.    Defendants had actual knowledge of the deceptive conduct alleged herein, or acted with deliberately reckless disregard for the effect of their deceptive conduct. The facts demonstrating that Defendants acted with actual knowledge and/or deliberate recklessness are stated in Section X.

330.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and SEC Rule 10b-5(a) and Rule 10b-5(c) promulgated thereunder.

331.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and members of the Class suffered damages in connection with their respective purchases of Merck common stock and/or call options or sales of put options during the Class Period.

## COUNT III

### Against the Individual Defendants
### for Violations of Section 20(a) of the Exchange Act

332.    Lead Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

333.    This Count is asserted pursuant to Section 20(a) of the Exchange Act on behalf of Lead Plaintiffs and the Class against the Individual Defendants.

334.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, the Individual Defendants knew the adverse non-public information about Gardasil demand in China, Gardasil's

109

growth prospects in China, Zhifei's sell-through of Gardasil, Zhifei's Gardasil inventory levels, and overall Gardasil channel inventory in China.

335.    As officers of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to promptly correct any public statements issued by the Company which had become materially false or misleading.

336.    Because of their positions of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Merck securities.

337.    By reason of the above conduct, the Individual Defendants are jointly and severally liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

**PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiffs, on behalf of themselves and the Class, pray for judgment and relief as follows:

(a)    Declaring this Action to be a proper class action, certifying Lead Plaintiffs as Class Representatives under Rule 23 of the Federal Rules of Civil Procedure and designating Co-Lead Counsel as Class Counsel;

110

(b)     Awarding damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, together with interest thereon;

(c)     Awarding Lead Plaintiffs and the Class reasonable costs and expenses incurred in this Action, including counsel fees, expert fees, other costs and disbursements; and

(d)     Awarding Lead Plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

<u>**JURY TRIAL DEMANDED**</u>

Lead Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: February 20, 2026                                 Respectfully submitted,


/s/*John C. Coyle IV*
**LABATON KELLER SUCHAROW LLP**
Carol C. Villegas (*pro hac vice* forthcoming)
Christine M. Fox (*pro hac vice* pending)
Adam M. Federer (*pro hac vice* pending)
John C. Coyle IV (ID: 467722024)
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
cvillegas@labaton.com
cfox@labaton.com
afederer@labaton.com
jcoyle@labaton.com

111

**ROBBINS GELLER RUDMAN & DOWD LLP**
Tor Gronborg (*pro hac vice*)
Trig R. Smith (*pro hac vice*)
Heather G. Geiger (*pro hac vice*)
John M. Kelley (*pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone: (619) 231-1058
torg@rgrdlaw.com
trigs@rgrdlaw.com
hgeiger@rgrdlaw.com
jkelley@rgrdlaw.com

**ROBBINS GELLER RUDMAN & DOWD LLP**
Willow E. Radcliffe (*pro hac vice*)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: (415) 288-4545
willowr@rgrdlaw.com

**MOTLEY RICE LLC**
Christopher F. Moriarty (*pro hac vice*)
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Telephone: (843) 216-9000
cmoriarty@motleyrice.com

**MOTLEY RICE LLC**
Daniel R. Lapinski (ID: 004612001)
210 Lake Drive East, Suite 101
Cherry Hill, NJ  08002
Telephone: (856) 667-0500
dlapinski@motleyrice.com

*Co-Lead Counsel for Lead Plaintiffs*

112

**KASOWITZ LLP**
Stephen W. Tountas (ID: 037962003)
One Gateway Center, Suite 2600
Newark, NJ 07102
Telephone: (973) 645-9462
Facsimile: (973) 643-2030
stountas@kasowitz.com

*Liaison Counsel*

113

# APPENDIX A

**CLASS PERIOD TRADING OF INDIVIDUAL DEFENDANTS**
10/26/23 – 2/3/25

| Defendant Davis' Class Period Stock Sales | | | |
|---|---|---|---|
| **Date** | **Average Stock Price** | **Number of Shares Sold** | **Proceeds** |
| February 13, 2024 | $126.37 | 25,324 | $3,200,277 |
| February 13, 2024 | $125.74 | 124,676 | $15,677,147 |
| February 14, 2024 | $125.40 | 85,021 | $10,661,574 |
| **TOTAL PROCEEDS** | | **235,021** | **$29,538,998** |
| **TOTAL PROFIT[14]** | | | **$12,143,240** |

* * *

| Defendant Litchfield's Class Period Stock Sales | | | |
|---|---|---|---|
| **Date** | **Average Stock Price** | **Number of Shares Sold** | **Proceeds** |
| February 14, 2024 | $125.50 | 38,291 | $4,805,521 |
| **TOTAL PROCEEDS** | | **38,291** | **$4,805,521** |
| **TOTAL PROFIT** | | | **$2,581,579** |

* * *

| Defendant Oosthuizen's Class Period Stock Sales | | | |
|---|---|---|---|
| **Date** | **Average Stock Price** | **Number of Shares Sold** | **Proceeds** |
| November 9, 2023 | $102.38 | 2,081 | $213,061 |
| February 14, 2024 | $127.18 | 18,959 | $2,411,111 |
| **TOTAL PROCEEDS** | | **21,040** | **$2,624,172** |
| **TOTAL PROFIT** | | | **$1,130,139** |

* * *

---

[14] The Individual Defendants' profits realized from their stock sales were calculated by subtracting the option exercise cost (if any) from the proceeds of each respective sale. The strike price for Davis' options in connection with his Class Period sales was approximately $74/share, the strike price for Litchfield's options in connection with her Class Period sales was approximately $58 per share, and the strike price for Oosthuizen's options in connection with his Class Period February 2, 2024 sale was approximately $78 per share. Davis, Litchfield, and Oosthuizen immediately earned returns of 68%, 115%, and 46% respectively.

114

| Defendant Romanelli's Class Period Stock Sale | | | |
|---|---|---|---|
| **Date** | **Average Stock Price** | **Number of Shares Sold** | **Proceeds** |
| February 13, 2024 | $124.89 | 1,000 | $124,888 |
| **TOTAL PROCEEDS** | | **1,000** | **$124,888** |
| **TOTAL PROFIT** | | | **$124,888** |

115